OFFICE COPY

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Andrew K. Glenn (aglenn@kasowitz.com)
David E. Ross (dross@kasowitz.com)
Joshua T. Kluewer (jkluewer@kasowitz.com)
1633 Broadway
New York, New York, 10019
Tel: (212) 506-1700



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------X
FILLMORE EAST BS FINANCE
SUBSIDIARY LLC,

                                   Plaintiffs,

            -against-

CAPMARK BANK, and TPR DOWNTOWN
INVESTMENTS, LLC,

                                   Defendants.
-----------------------------------------X

Civil Action No.:

Removed from the New York State
Supreme Court, New York County,
Index No. 651502-11

**NOTICE OF REMOVAL**

     **PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446,

Defendant TPR Downtown Investments, LLC ("TPR"), by and through its undersigned counsel,

hereby files its Notice of Removal of this civil action from the Supreme Court of the State of New

York, County of New York, to the United States District Court for the Southern District of New

York. TPR appears for the purpose of removal only and for no other purpose, reserves all rights

and defenses available to it, and states as follows:

     1.  On or about June 1, 2011, Fillmore East BS Finance Subsidiary LLC ("Fillmore East

BS") filed a summons and verified complaint against Capmark Bank ("Capmark") and TPR in

the Supreme Court of the State of New York, County of New York, Index No. 651502-11 (the

"Action"). A copy of the summons and verified complaint are annexed as Exhibit A hereto.

     2.  On June 2, 2011, Capmark received a copy of the summons and verified complaint by

Federal Express. On June 3, 2011, TPR received a copy of the summons and verified complaint

by Federal Express.

3. In accordance with the requirements of 28 U.S.C. § 1446(b), this Notice of Removal is filed within 30 days of the first date on which TPR and Capmark (collectively the "Defendants") received a copy of the summons and verified complaint.

4. Neither of Defendants has served a responsive pleading to the verified complaint, and no orders have been issued in the Action. A copy of all pleadings and other papers filed in the Action are annexed as part of Exhibit A, pursuant to 28 U.S.C. § 1446(a).

5. The Action is a civil action over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), and is one which may be removed to this Court pursuant to the provisions of 28 U.S.C. § 1441, as the parties are citizens of different states and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

6. Plaintiff Fillmore East BS is a Delaware limited liability company with its principal place of business in California. Ex. A, Verified Complaint, ¶ 1. Plaintiff's counsel has advised that Plaintiff's sole member is a citizen of Maryland.

7. Defendant Capmark is a banking corporation formed under the laws of Utah with its principal place of business in Utah. Ex. A, Verified Complaint, ¶ 2.

8. Defendant TPR is a Florida limited liability company with its principal place of business in Florida. None of TPR's members is a citizen of Maryland.

9. Plaintiff's verified complaint seeks damages in excess of $50 million exclusive of interest and costs. Ex. A, Verified Complaint, ¶¶ 77, 85, 90, 97, 104.

10. Defendant Capmark consents to removal of this case to this Court.

11. The written notice required by 28 U.S.C. § 1446(d) will be promptly filed in the Supreme Court of the State of New York, County of New York, and served on Plaintiff.

**WHEREFORE,** TPR respectfully removes the Action from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York.

Dated:  June 30, 2011

Respectfully submitted,

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP

By: _____
      Andrew K. Glenn, Esq.
      David E. Ross, Esq.
      Joshua T. Kluewer, Esq.

*Attorneys for Defendant*
*TPR Downtown Investments, LLC*

TO:

Mark Slama, Esq.
Tina Gagliano, Esq.
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
(212) 237-1000
*Attorneys for Plaintiff*
*Fillmore East BS Finance Subsidiary LLC*

Gil Feder, Esq.
Meagan Crowley, Esq.
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
(212) 521-5400
*Attorneys for Defendant*
*Capmark Bank*

4

**EXHIBIT A TO NOTICE OF REMOVAL**

FILED: NEW YORK COUNTY CLERK 06/01/2011

NYSCEF DOC. NO. 1

INDEX NO. 651502/2011

RECEIVED NYSCEF: 06/01/2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
FILLMORE EAST BS FINANCE                                      :    Index No.:
SUBSIDIARY LLC,                                               :
                                                              :    **SUMMONS**
                                   Plaintiff,                 :
                                                              :
                      - against -                             :
                                                              :
CAPMARK BANK and TPR DOWNTOWN                                 :
INVESTMENTS, LLC,                                             :
                                                              :
                                   Defendants.                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TO THE ABOVE-NAMED DEFENDANTS:

   You are hereby summoned and required to serve upon Plaintiff's attorney an Answer to the Verified Complaint in this action within twenty (20) days after the service of this Summons, exclusive of the day of service, or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: New York, New York
       June 1, 2011

                         Respectfully submitted,

                         WINDELS MARX LANE & MITTENDORF, LLP

                         By _Mark Slama_____
                            Mark Slama
                            Tina Gagliano
                            156 West 56th Street
                            New York, New York 10019
                            (212) 237-1000
                            *Attorneys for Plaintiff*

{10630312}                                    1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| FILLMORE EAST BS FINANCE<br>SUBSIDIARY LLC, | :    Index No.: |
| | : |
| | :    **VERIFIED COMPLAINT** |
| Plaintiff, | : |
| | : |
| - against - | : |
| | : |
| CAPMARK BANK and TPR DOWNTOWN<br>INVESTMENTS, LLC, | : |
| | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Fillmore East BS Finance Subsidiary LLC, by and through its counsel,

Windels Marx Lane & Mittendorf, LLP, as and for its Verified Complaint (the

"Complaint"), alleges as follows:

## PARTIES

1.      Plaintiff Fillmore East BS Finance Subsidiary LLC ("Fillmore") is a

Delaware limited liability company with a principal place of business at 4 Embarcadero

Center, Suite 710, San Francisco, CA.

2.      Upon information and belief, Defendant Capmark Bank ("Capmark

Bank") is a Utah bank, with a principal place of business at 6955 Union Park Center,

Suite 330, Midvale, Utah 84047.

3.      Upon information and belief, Capmark Finance, Inc. ("Capmark Finance")

is a California corporation, with a principal place of business at 8201 Greensboro Drive,

Suite 301 McClean, Virginia and 116 Welch Road, Horsham, Pennsylvania.  Upon

information and belief, Capmark Finance has filed a bankruptcy petition and cannot, at

this time, be joined in the action as a party defendant.

2

4.     Upon information and belief, TPR Downtown Investments, LLC, ("TPR") is a limited liability company with a place of business at 315 S. Biscayne Boulevard, 4th Fl., Miami, Florida.  Upon information and belief, TPR is the successor and assignee to Capmark Bank and bound by Capmark Bank's actions with respect to the matter alleged herein as well as to any adjudication made in this action.

5.     TPR is joined as a party defendant in the action for the purpose of binding TPR to any adjudication and declaratory judgment made by this Court and because it is now a Co-Lender under the Co-Lending Agreement (defined below).

6.     Upon information and belief, Capmark Bank and Capmark Finance share common ownership, employees, management, and engaged in common decision making with respect to the matters set forth in this Complaint so that there is no real distinction in fact between one another with respect to the matters before the Court in this action.

7.     Upon information and belief, at all times relevant to this Complaint, Capmark Bank directed and controlled the actions and conduct of Capmark Finance with respect to the events and circumstances set forth below and exercised such dominion and control over its actions and conduct so as to be the alter ego of and responsible for the actions and wrongful conduct of Capmark Finance.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over the Defendants under and by virtue of, *inter alia*, CPLR § 301.

9.     Venue of this action in this Court is proper under and by virtue of, *inter alia*, CPLR § 501.  Venue is also proper because, upon information and belief, Capmark Bank engaged in multiple negotiations with various parties identified below in the State of New York and because the parties to the Co-Lending Agreement (defined below)

contractually consented to the jurisdiction of the Courts of the State of New York for the resolution of any disputes thereunder.

## FACTS

### The Loan

10.     Downtown Miami Mall LLC and Downtown Miami Hotel LLC (the "Borrower") entered into a loan agreement dated as of May 31, 2007 (the "Loan Agreement") as borrower with Capmark Bank, as Co-Lender, Capmark Finance, as Co-Lender, Capmark Finance, as Agent for the Co-Lenders and Capmark Securities, Inc., as lead arranger.

11.     Pursuant to the Loan Agreement, Borrower obtained a commercial mortgage loan in the original principal amount of $220,000,000.00 (the "Loan"). The Loan is secured, in part, by a mortgage on real property in Miami, Florida known as the Omni International Mall Complex (the "Mortgaged Property") which consists of a hotel, retail and office space.

12.     The Loan Agreement sets forth a payment schedule, pursuant to which the Borrower agreed it would re-pay the Loan. The Loan Agreement also included a "Maturity Date," by which date the Borrower would pay all outstanding principal, accrued interest and other sums due under the Loan, subject to the contractual rights of the Borrower to extend the Maturity Date.

13.     Section 2.03(c) of the Loan Agreement provides that on or before June 9, 2010:

> Borrower shall pay the entire outstanding principal balance of the Loan, together with all accrued but unpaid interest thereon through the end of the then current Interest Accrual Period and all other amounts due under this Loan

> Agreement, the Note or any other Loan Document; provided that, if the ninth (9th) day of such month is not a Business Day, such payment shall be due and payable on the immediately preceding Business Day.

14.     Section 11.01(c) of the Loan Agreement provides that an "Event of Default" occurs, *inter alia*, "if unpaid principal, accrued but unpaid interest and all other amounts outstanding under the Loan Documents are not paid in full on or before the Maturity Date."

15.     The Borrower had the contractual right pursuant to the Loan Agreement to extend the Maturity Date, upon proper notice and the payment of a fee equal to .125% of the then outstanding principal amount of the Loan (the "Extension Fee"), together with the satisfaction of certain other conditions, for two additional one-year terms or through June 9, 2012.

**The Promissory Notes**

16.     The Loan is evidenced by two promissory notes: Promissory Note A and Promissory Note B.

17.     At all times relevant to the allegations set forth in this Complaint, and until Capmark Bank undertook effort to sell and transfer its interest to TPR, Promissory Note A was held by Capmark Bank. The outstanding principal balance of Promissory Note A is approximately $159,853,740 ("Note A") .

18.     Fillmore owns all right, title and interest in Promissory Note B. The outstanding principal balance of Promissory Note B is approximately $45,105,474 (not including any accrued and unpaid interest, default interest, late charges and other amounts that may be due and payable) ("Note B").

19.     Fillmore East MS Finance Subsidiary, LLC ("Fillmore East MS") acquired Note B through an Allonge dated as of June 7, 2007 and an Assignment and Assumption dated as of June 7, 2007 from Capmark Finance, Inc, as the initial Note B Co-Lender.  Fillmore East MS subsequently assigned Note B to Fillmore on or about April 18, 2008.

20.     Pursuant to the terms and conditions of that certain Co-Lending and Servicing Agreement, dated as of May 31, 2007 (more particularly described below) Note B is subordinate to Note A, although both notes are secured by the same collateral, which includes the Mortgaged Property and the income generated from its operations.

**The Servicing Agreement**

21.     Capmark Bank, as Co-Lender, Capmark Finance as Co-Lender, and Capmark Finance as Agent for Co-Lenders and Servicer, entered into a Co-Lending and Servicing Agreement, dated as of May 31, 2007 (the "Servicing Agreement").  Fillmore was made a party, as a Co-Lender, to the Servicing Agreement by reason of its acquired ownership of Note B.

22.     Under Section 2(a) of the Servicing Agreement, Capmark Finance was appointed to act as the Servicer of the Loan, and the attorney-in-fact for such purpose.  It was "authorized to act on behalf and for the benefit of the Co-Lenders and Agent, to administer, manage, and service the Loan and collect payments under the Loan and enforce the Loan Documents in a manner consistent with this Agreement, all applicable laws and the Servicing Standard; to receive all payments on the Loan, to exercise all other powers granted to Servicer in this Agreement; and to exercise all such powers as are incidental or necessary to any of the foregoing."

23.     Furthermore, the Servicing Agreement provides that "[e]ach Co-Lender and Agent (in such capacity) hereby appoints Servicer as the attorney-in-fact for itself and for each Co-Lender to sign any documents reasonably required by Servicer with respect to the administration and servicing of the Loan and Note A and Note B on its behalf under this Agreement."

24.     The Servicing Agreement defines a "Servicing Event of Default," *inter alia*, as "any failure on the part of the Servicer [Capmark Finance] to (i) duly abide by the Servicing Standard in any material respect."

25.     The "Servicing Standard" in the Servicing Agreement imposes a duty upon Capmark Finance, *inter alia*, to exercise independent reasonable business judgment and act "in the best interests of the Co-Lenders (taking into account the relative priority of Note A and Note B)" and "with a view to the maximization of timely recovery of principal and interest on the Loan, but without regard to . . . the ownership of any interest in the Loan by Servicer to any Affiliate of Servicer."

26.     On or about September 18, 2009, Capmark Finance notified Fillmore that Berkadia Commercial Mortgage ("Berkadia") would be servicing the loan in place of Capmark Finance.  For reasons unknown to Fillmore, and contrary to the September 18, 2009 letter, Capmark Finance did not transfer these duties to Berkadia and Capmark Finance continued to act as the "servicer" under the Servicing Agreement.

27.     On or about October, 25, 2009, Capmark Financial Group, Inc. and certain of its affiliates and subsidiaries (including Capmark Finance, Inc. and Capmark Securities Inc. (lead arranger under the Loan)) filed a bankruptcy petition. Fillmore never

received formal notice of the bankruptcy nor has it participated in these proceedings although it reserves the right to do so.

**The Borrower's Default**

28.     In the spring of 2010, the Borrower was entitled under the terms of the Loan Agreement, upon notice and the payment of the Extension Fee to extend the Maturity Date from June 9, 2010 to June 9, 2011 and thereafter in accordance with the terms of the Loan Agreement.

29.     The amount of the applicable Extension Fee payable in June 2010 was approximately $257,383 or 0.125% of the then outstanding principal balance of the Loan.

30.     Upon information and belief, Borrower was ready, willing, and able to provide the requisite notice and pay the Extension Fee to extend the Maturity Date and avoid having an Event of Default occur.

31.     As set forth below, Capmark Bank took action designed to induce Borrower to refrain from, and avoid paying, the Extension Fee thereby causing the Loan to go into default.

32.     Upon information and belief, Capmark Bank and Capmark Finance engaged in numerous restructuring discussions with the Borrower prior to the Maturity Date, which included proposals reducing the principal amount of the Loan and the provision of payments to the Borrower senior in priority to payments to Fillmore.

33.     Upon information and belief, during the pre Maturity Date restructuring discussions with the Borrower, Capmark Bank and Capmark Finance advised Borrower that upon the expiration of a sixty (60) day time period after the scheduled Maturity Date, Fillmore would no longer need to be involved in any decision-making concerning the

restructuring of the Loan and, further, that Capmark Bank would have greater flexibility to restructure the Loan if the Loan went into default rather than been extended.

34. On or about May 14, 2010, Capmark Bank advised Fillmore that it was "unlikely" that the Borrower would pay the Extension Fee and was "unlikely" to extend the Maturity Date of the Loan.

35. On or about May 28, 2010, Capmark Finance, as Servicer, produced a term sheet to Fillmore regarding a potential restructure of the loan with the Borrower (the "May Term Sheet").

36. The May Term Sheet contained proposals by Capmark Finance and Capmark Bank whereby payments would be made to the "defaulting" Borrower prior to payments being made to Fillmore.

37. Prior to the issuance of the May Term Sheet, Fillmore had expended in excess of $19 million dollars to support and benefit the Mortgaged Property. Fillmore had no information and received no indication from the Servicer, Capmark Bank or the Borrower that the Borrower was not going to exercise its option to extend the loan.

38. Despite Capmark Bank's statements to Fillmore regarding the Borrower's unlikely extension of the loan, Borrower had procured and benefitted leaseholds at the Mortgaged Property which enhanced the value of the Mortgaged Property and the cash flow generated therefrom in a manner consistent with its continued ownership and management of the Mortgaged Property. It, therefore, appeared that Borrower had every incentive to extend the Loan and did not take action consistent with permitting an Event of Default to occur.

39.     Capmark Bank and Capmark Finance each knew that Borrower's failure to formally extend the Maturity Date would cause an Event of Default under the terms of the Loan Documents it executed in favor of Capmark Bank and Fillmore.

40.     Upon information and belief, however, Capmark Bank and Capmark Finance willfully induced Borrower not to extend the Maturity Date and allow the Loan to go into default by reason of the promises and financial incentives they offered to Borrower on the condition that Borrower not exercise its contractual remedies to extend the Maturity Date.

41.     Upon information and belief, based upon Capmark Bank's and Capmark Finance's misleading representations and inducements, Borrower did not extend the Maturity Date of the Loan, relying upon Capmark Bank and Capmark Finance's misrepresentations and false promises that a restructuring would promptly occur after the Maturity Date expired on June 9, 2010.

42.     By notice dated June 11, 2010, Capmark Finance declared Borrower in default of the Loan after it failed to extend the Maturity Date of the Loan by paying the Extension Fee.

43.     On or about June 22, 2010, Fillmore provided Capmark Finance and Capmark Bank with an initial restructure proposal. Throughout the summer of 2010 Capmark Finance, Capmark Bank and Fillmore engaged in discussions regarding the restructuring of the Loan. On or about August 2, 2010, Fillmore provided Capmark Finance and Capmark Bank with a revised restructure proposal. Notably, during this time, Fillmore was the "Controlling Holder" (as defined in the Servicing Agreement) of

the Loan and no major decision about the Loan could be made without Fillmore's consent.

44.    On or about August 18, 2010, Capmark Bank entered into a Pre Negotiation Agreement ("PNA") with Fillmore indicating that they were willing to continue to negotiate with Fillmore in good faith to restructure the Loan.

45.    On or about August 27, 2010, Capmark Finance, as Servicer, advised Fillmore in writing that a "Control Appraisal Period" had commenced and as a result, Fillmore lost its rights to consent to the terms of a restructuring of the Loan which is consistent with what Capmark Bank and Capmark Finance advised Borrower would occur but inconsistent with the PNA and Capmark Bank's duty to act in good faith and Capmark Finance's contractual obligations. The Borrower is not a party to the Servicing Agreement.

46.    Upon information and belief, Capmark Bank sustained extreme financial distress and decided quite suddenly on or around early September, 2010 to sell its interests in Note A and cease discussions regarding restructure of the Loan which came as a complete surprise to Fillmore as Capmark Bank had previously said they would negotiate a restructure term sheet simultaneously with the sale evaluation process which is why Capmark Bank and Fillmore entered into the PNA.  Capmark Bank then took action to sell and market Note A without any input or consultation from Fillmore and hired a broker to market and sell its Note A to third parties.

47.    Upon information and belief, in early September 2010, Capmark Bank and Capmark Finance advised the Borrower that they engaged a broker to value the Mortgaged Property and Note A.

48.     Upon information and belief, in early September 2010, Capmark Bank acknowledged that that Borrower was the only realistic party to whom Capmark Bank could sell Note A and agreed to provide the Borrower with a last look, or the ability to match the best offer to purchase Note A; in exchange for the Borrower agreeing to cooperate and assist Capmark Bank in their efforts to value Note A and the Mortgaged Property (including conducting property tours and numerous activities not required by the loan documents).

49.     Upon information and belief, Borrower relied upon Capmark Bank's assurances and continued to invest time and resources in pursuing the restructuring and/or acquisition of Note A, but, despite these representations, Capmark Bank ceased any restructuring discussions with the Borrower or its affiliates.

50.     Upon information and belief Capmark Bank has sold Note A to a third party or is in the process of consummating such transactions to a third-party purchaser at a substantial discount. Upon information and belief, the identity of the third-party is TPR Downtown Investments LLC which will seek to liquidate the collateral for the Loan and cause a foreclosure sale to occur at a distressed price resulting in no recovery for Fillmore, but which will yield a windfall for the holder of Note A.

51.     Upon information and belief, the Borrower and its affiliated entity, Omni Development LLC ("ODL") repeatedly expressed its desire and intention to retain ownership, possession and control over the Mortgaged Property and control the repayment terms of the debt encumbering the Mortgaged Property so that repayment of the Loan could be effectuated in a manner acceptable to the holders of Note A and Note

B and to avoid foreclosure litigation or allowing any event of default to occur which would impair the Mortgaged Property or its ability to satisfy both lenders.

52.    Had Borrower or an affiliated entity such as ODL acquired Note A it would not seek to liquidate the Mortgaged Property and, instead, would retain, improve and enhance same for its benefit and for that of Fillmore.

**The Omni Litigation**

53.    On or about May 10, 2011, Borrower commenced an action in the Supreme Court of the State of New York, County of New York entitled, Omni Development, LLC v. Capmark Bank, Index No. 651272/2011 (the "Omni Litigation") in which plaintiff ODL, an investor in the Mortgaged Property, alleged that it reached an agreement with Capmark Bank to purchase the Note A held by Capmark Bank on the same terms and conditions as a third party bidder would pay in the market place under arm's length conditions.

54.    As set forth in the Omni Litigation and upon information and belief, plaintiff ODL informed Capmark Bank and its agents that it was working with Fillmore and the Borrower to address repayment of the Fillmore debt following its anticipated acquisition of the Capmark Bank's Note A.

55.    As set forth in the Omni Litigation and upon information and belief, ODL and Borrower were induced to take action (and refrain from acting) and thereby materially changed their position in furtherance of the expected transactions with Capmark Bank which would culminate in Capmark Bank's restructure of the Loan with the Borrower and the Borrower's repayment of debt owed to Fillmore on terms mutually acceptable to the parties.

56.     Upon information and belief and as set forth in the Omni Litigation, in reliance upon the agreement by Capmark Bank to restructure the Loan for the benefit of ODL and the Borrower, payment of the Extension Fee was not made and the Loan was not formally extended pursuant to its terms.   Consequently, Borrower and ODL were induced to allow the Maturity Date to pass without paying the Extension Fee and preserving their right to formally extend the loan (or cure any default) which they believed they were purchasing based upon the agreement reached with Capmark Bank.

57.     The collateral for the Loan consists of valuable commercial real property which generates cash flow sufficient to pay both the holder of Note A and Fillmore.  But for Capmark Bank's wrongful conduct and that of its agent Capmark Finance, the Loan Maturity Date would have been extended as of right, remain in good standing, and no default would have taken place which threatens to impair Fillmore's interests in Note B and the Mortgaged Property.   The value of the Mortgaged Property continues to be enhanced by additional leaseholds and other improvements to the collateral made by the Borrower and ODL and if Borrower and ODL rehabilitate the Mortgaged Property Fillmore believes it can be fully repaid.

58.     By reason of the foregoing wrongful conduct by Capmark Bank and its agent, breach of agreement and wrongful interference by Capmark Bank and Capmark Finance, Fillmore has been damaged.

59.     The existence of an Event of Default and the specter of foreclosure litigation also makes it improbable that Borrower can refinance the debt on commercially reasonable terms and salvage any equity it has in the Mortgaged Property or repay Fillmore as promised.

60.     As a direct consequence of Borrower's default under the Loan and the sale of Note A to a third party (identified herein as TPR Downtown Investments, LLC), Fillmore will likely be unable to recover any of the funds owed to it under Note B and its economic position has been materially impaired by reason of Capmark Bank's and Capmark Finance's misconduct and deliberate false and misleading representations.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

61.     Fillmore repeats the prior allegations as if fully set forth at length herein.

62.     The Servicing Agreement is a valid contract between, *inter alia*, plaintiff Fillmore and Capmark Finance and its alter ego Capmark Bank.

63.     Fillmore fully performed its obligations under the Servicing Agreement. Capmark Bank took control of Capmark Finance, a bankrupt entity, in a manner which diminished Capmark Finance's ability to make independent and unbiased decisions so as to act at the direction and for the benefit of Capmark Bank.

64.     By inducing Borrower to default on the Loan based upon promises and representations, which were misleading and false, Defendant Capmark Bank and its alter ego Capmark Finance breached contractual obligations owed to Fillmore.

65.     By inducing ODL to provide Capmark Bank with in-depth tours and inspections of the Mortgaged Property, financial data and information related to the Mortgaged Property and its operations and taking other action in furtherance of the defendant's agreement to sell Note A to ODL, Capmark Bank breached its contractual obligations to ODL and Borrower to sell Note A, which was intended to also benefit Fillmore and the Note B position.  Moreover, any actions taken by Capmark Finance were for the benefit of Capmark Bank and in violation of the Servicing Agreement.

66.     Actions taken by Capmark Finance under cover of the Servicing Agreement may have been authorized by Capmark Bank but really just served as a disguise for it to assist Capmark Bank especially in light of its bankruptcy status. Capmark Finance should have transferred the loan servicing responsibilities under the Servicing Agreement to Berkadia as the parties were so notified in writing and neither Capmark Bank nor Capmark Finance offered Fillmore any explanation or information as to why Capmark Finance continued to act as Servicer in connection with the Loan.

67.     The breach of the Servicing Agreement by Capmark Bank and its agent and alter ego directly and proximately injured Fillmore, because Fillmore's ability to recover the monies owed it under Note B as a result of the default has been diminished, impaired and possibly vitiated.

68.     As a result of the breach, Fillmore has incurred, and will continue to incur substantial damages.

69.     Plaintiff Fillmore is therefore entitled to a judgment against Capmark Bank for all damages, including attorneys' fees, in an amount to be determined at trial, but in any event not less than $50,000,000 or, in the alternative, requiring that defendant repurchase the Note B for its face value.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

70.     Fillmore repeats the prior allegations as if set forth more fully herein.

71.     The covenant of good faith and fair dealing exists within every contract.

72.     By inducing Borrower to default on the Loan and not extend the Maturity Date, Defendant Capmark Bank and its affiliate Capmark Finance conspired with one another to devise a common scheme and plan to impair and diminish Fillmore's rights in

the collateral and Note B in contravention of their respective contractual and fiduciary obligations.

73.     By falsely promising ODL that it had a right of purchase of Note A then selling Note A to a third party (believed to be TPR), Defendant and its affiliate Capmark Finance knew Fillmore would be harmed because ODL and Borrower were to pay Fillmore all or a portion of Note B in connection with their acquisition of Note A.

74.     Defendant Capmark Bank acted in bad faith, and sought to prevent Fillmore from receiving the benefits contracted for in the Loan Agreement, the Servicing Agreement, Note B, and related Loan documents as well as with the payments Fillmore reasonably expected as a result of Capmark Bank's conduct and expressed desire to act in good faith with regard to its dealings with the Borrower and ODL.

75.     Capmark Bank's unjustifiable hindrance of Fillmore's ability to receive the benefits contracted for in the Loan Agreement, the Servicing Agreement, Note B, and related Loan documents, constitutes a breach of the covenant of good faith and fair dealing that exists in those agreements and has hampered and interfered with Fillmore's anticipated benefits which flow therefrom.

76.     As a result of Capmark Bank's breach of the covenant of good faith and fair dealing, Fillmore has incurred, and will continue to incur, substantial damages.

77.     Plaintiff Fillmore is therefore entitled to a judgment against Capmark Bank for all damages resulting from Defendants' breach of the covenant of good faith and fair dealing, in an amount to be determined at trial, but in any event not less than $50,000,000.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Breach of Fiduciary Duties and Aiding and Abetting Such Breach)**

78.     Fillmore repeats the prior allegations as if set forth more fully herein.

79.     As the Servicer of the Loan, and pursuant to the Servicing Agreement, Capmark Finance owed Fillmore certain fiduciary duties which were non-delegable and which require Capmark Finance to act independent of Capmark Bank in order to discharge its duty of trust, confidence and fair dealing.

80.     Capmark Bank, as the Co-Lender and the entity that directed and controlled the actions and the conduct of Capmark Finance in servicing the Loan, had a fiduciary duty to Fillmore to act as an honest and trustworthy partner in the administration of the Loan and to maximize the value of the collateral on behalf of Capmark Bank and Fillmore.

81.     By inducing Borrower to default under the Loan and selling Note A to a third-party purchaser without Fillmore's knowledge, consent or for the benefit of ODL which would have made payment to Fillmore, such action was undertaken to the detriment of Fillmore and the collateral for the loan and for the sole benefit of Capmark Bank. Capmark Finance had an incentive to do so because, upon information and belief, it shares common ownership and control with Capmark Bank and acted to discharge its obligations at the sole direction and instruction of Capmark Bank. Moreover, Capmark Finance continued to earn fees as the Servicer of the loans by not transferring the servicing rights to Berkadia. Consequently, Capmark Finance breached fiduciary duties owed to Fillmore and elected, instead, to act in a manner favorable to Capmark Bank and in violation of the Servicing Standard, (specifically its obligation to act with a view to the maximization of timely recovery of principal and interest on the Loan which if adhered to would have resulted in the proper extension of the Loan), because, inter alia, it was

delegating its duties to Capmark Bank which had no right to discharge and could not discharge same in an independent and fair manner.

82.   Capmark Finance had a conflict of interest when it elected to favor Capmark Bank's interests (and its own) over those of Fillmore and follow Capmark Bank's direction and control.

83.   Upon information and belief, Capmark Bank instructed, influenced, and conspired with Capmark Finance to induce it to breach its fiduciary duties and obligations to all parties to the Servicing Agreement.

84.   Upon information and belief, Capmark Bank aided and abetted its affiliate Capmark Finance, to breach its fiduciary duties to Fillmore which breach caused Fillmore to sustain damages.

85.   Fillmore was directly damaged by Capmark Bank's misconduct, in an amount to be determined by the Court, but in any event no less than $50,000,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Tortious Interference with a Contract)

86.   Fillmore repeats the prior allegations as if set forth more fully herein.

87.   Fillmore, as Co-Lender, and Borrower, as borrower, have a valid and existing contract as evidenced by, *inter alia*, the Loan Agreement and Note B.

88.   Capmark Bank and Capmark Finance have, and had at all relevant times, actual knowledge of Fillmore's contractual relationships with Borrower. By inducing Borrower to decline to extend the Maturity Date and to instead permit a default under the Loan Agreement to occur in a manner detrimental to Fillmore, Capmark Bank and Capmark Finance deliberately caused Borrower to breach the Loan Agreement. Capmark

Bank's and Capmark Finance's actions inducing Borrower to breach the Loan Agreement were designed to injure Fillmore and are entirely unjustified and wrongful. Capmark Bank knew that such wrongful conduct would cause Fillmore to sustain damages.

89.     Borrower breached the Loan Agreement by failing to pay the required principal and accrued interest on the Maturity Date because it was induced to refrain from exercising its contractual right to extend the Maturity Date by Capmark Bank.

90.     As a result, Fillmore has incurred damages, in an amount to be determined at trial, but in any event not less than $50,000,000.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Gross Negligence)

91.     Fillmore repeats the prior allegations as if set forth more fully herein.

92.     As Servicer of the Loan, Capmark Finance owed Fillmore a duty to exercise care, caution, honesty, and good judgment in the servicing of the Loan pursuant to the Servicing Standard as defined in the Servicing Agreement and common industry practice.

93.     As a Co-Lender of the Loan, Capmark Bank owed Fillmore a duty to exercise care in its actions concerning the Loan Agreement and the Servicing Agreement.

94.     Capmark Finance acted at the direction of Capmark Bank which conduct and actions was discharged with gross negligence by egregiously breaching the duty of care to Fillmore and by failing to exercise even a minimum degree of care in servicing and administering the Loan and acting carelessly and with reckless disregard as to Fillmore's rights under the Servicing Agreement by inducing Borrower to default on the Loan and not extend the Maturity Date. Capmark Finance disregarded its duties and obligations to Fillmore in a manner which not only fell below the standard of care, but

demonstrated a wanton disregard for prevailing business practice and customs in servicing real estate loans and protecting the value of the collateral.

95.     Capmark Bank acted with gross negligence by egregiously breaching its duty of care to Fillmore by failing to exercise even the slightest degree of care in performing under the Loan Agreement and Servicing Agreement and acting carelessly and with reckless disregard as to Fillmore's rights under those agreements by instructing, influencing, and conspiring with Capmark Finance to induce Borrower to default on the Loan and impair, diminish, and devalue the collateral in a reckless and wanton manner.

96.     As a proximate result of Capmark Finance's egregious breach of their duty of care, Fillmore will likely be unable to recover any of the funds owed to it under Note B and its economic position has been materially impaired.

97.     By reason of Capmark Bank's gross negligence, Fillmore suffered compensatory damages in an amount to be determined at trial, but in any event not less than $50,000,000.

98.     By reason of its gross negligence, Capmark Bank should also be required to pay plaintiff punitive damages in an amount to be determined at trial.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Willful Misconduct)**

99.     Fillmore repeats the prior allegations as if set forth more fully herein.

100.    Capmark Bank intentionally induced Borrower to default on the Loan with the intention of benefitting Capmark Bank to the detriment of Fillmore and its interests in the Loan, as well as the financial viability of the collateral and the Borrower.

101.    At all relevant times, Capmark Bank knew that inducing Borrower to default on the Loan would likely and naturally result in significant monetary injury to

Fillmore and compounded that harm after Capmark Bank elected to sell Note A to a third party and not the Borrower or ODL.

102.    Capmark Bank's intentional inducement of Borrower to default under the Loan and then declare the Loan to be in default constitutes willful misconduct.

103.    Fillmore has been injured as a proximate and direct result of Capmark Bank's willful misconduct, and will likely be unable to recover any of the funds owed to it under Note B and its economic position has been materially impaired.

104.    By reason of Capmark Bank's egregious and willful misconduct, Fillmore suffered compensatory damages in an amount to be determined at trial, but in any event not less than $50,000,000.

105.    By reason of Capmark Bank's egregious and willful misconduct, Defendant should be required to pay plaintiff punitive damages in an amount to be determined at trial.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**(To Compel Capmark Bank and any subsequent owner of Note A**
**to Permit Borrower to Cure Default)**

106.    Fillmore respects the prior allegations as if set forth more fully herein.

107.    By reason of its false promises and misrepresentations, Capmark knowingly induced Borrower and ODL to allow a default to occur by not paying the Extension Fee prior to the Maturity Date as required by the Loan Agreement and not cure same.

108.    Upon information and belief, Borrower and ODL were ready, willing and able to pay any and all Extension Fees to prevent an event of default from occurring and to extend the Maturity Date to June 9, 2012.

109.   TPR as the assignee of Capmark Bank should be required to allow Borrower or ODL to cure any default and be compelled to accept the Extension Fee for the June 2010 and June 2011 extensions so that the new Maturity Date for the loan will be June 9, 2012 and all other terms and conditions in the Loan Agreements remain in full force and effect.

110.   The Loan Documents should be reformed, amended and modified to permit Borrower or ODL to pay any Extension Fee and charges at this time to cure any default and this Court should declare that after the Borrower or ODL have done so the new extended and enforceable Maturity Date is June 9, 2012.

111.   It is unjust and inequitable to prevent ODL and Borrower from making payment of the Extension Fee or curing the default because the default was caused by Capmark Bank's conduct.

112.   But for the false promises and inducement of Capmark Bank such payment would be made and Capmark Bank and any successor in interest should be equitably estopped from rejecting any such Extension Fee and the loan should be declared to have not been in default.

113.   By reason of Capmark Bank's wrongful conduct Fillmore has been damaged and by allowing ODL or Borrower to cure such default any damages sustained by Fillmore will be mitigated and an equitable outcome will be achieved.

114.   TPR as assignee of Capmark Bank is bound by the conduct of its predecessor in interest and must honor the obligations and duties of Capmark Bank with respect to the extension of the Maturity Date of the Loan and a declaration is sought to permit payment and cure by ODL or Borrower.

## AS AND FOR AN EIGTH CAUSE OF ACTION
### (Declaratory Judgment)

115.    Fillmore respects the prior allegations as if set forth more fully herein.

116.    There is a justicable controversy concerning:  (a) the actionable conduct by Capmark Bank, its affiliates and agents; (b) Capmark's breach of its contractual obligations directly and through its affiliates and agents; (c) Capmark Finance's authority to act as Servicer of the Loan and (d) Capmark Bank's conduct which conduct should bind any successors or assigns of Capmark Bank.

117.    A declaratory judgment is needed which allows Borrower or ODL to pay the Extension Fee and prevent an Event of Default from becoming effective in order to bind Capmark Bank's successors and assigns (which includes TPR) and avoid the damaging effects of Capmark Bank's conduct which could be irreparable if Borrower cannot cure the default caused by Capmark Bank.  Alternatively, a declaratory judgment is requested which enforces the right of ODL or Borrower to purchase Note A as Capmark Bank agreed to do prior to the sale of TPR

118.    A declaration should issue from this Court which compels, binds and mandates that TPR as Capmark Bank's successor by assignment be required to accept any tender or cure by Borrower or ODL of the Extension Fee and be enjoined from reusing to accept same or specifically perform its obligation to sell Note A to ODL or Borrower as alleged in the Omni Litigation..

119.    Fillmore will be irreparably harmed if Capmark Bank's successor refuses any tender of the Extension Fee and commences foreclosure proceedings which this Court should declare cannot take place by Capmark Bank or its successors and/or assigns if Borrower or ODL pay the Extension Fee and extend the Maturity Date to June 9, 2012.

**WHEREFORE**, Plaintiff demands judgment:

(a)    on its First Cause of Action, judgment against Capmark Bank for breach of contract, in an amount to be determined at trial, but in any event not less than $50,000,000 or, in the alternative that Capmark Bank or its successor in interest purchase Fillmore's Note B at face value.;

(b)    on its Second Cause of Action, judgment against Capmark Bank for breach of the covenant of good faith and fair dealing, in an amount to be determined at the trial of this action, but in any event not less than $50,000,000;

(c)    on its Third Cause of Action, judgment against Capmark Bank for breach of Capmark Finance's fiduciary duty, in an amount to be determined at the trial of this action, but in any event not less than $50,000,000;

(d)    on its Fourth Cause of Action, judgment against Capmark Bank for tortious interference with a contract, in an amount to be determined at the trial of this action, but in any event not less than $50,000,000, plus punitive damages;

(e)    on its Fifth Cause of Action, judgment against Capmark Bank for gross negligence, for compensatory and punitive damages, in an amount to be determined at the trial of this action, but in any event not less than $50,000,000;

(f)    on its Sixth Cause of Action, judgment against Capmark Bank for willful misconduct, for compensatory and punitive damages, in an amount to be determined at the trial of this action, but in any event not less than $50,000,000; and

(g)    on the Seventh Cause of Action for an order allowing cure by Borrower or ODL and equitably estopping Defendants or its successors in interest from alleging or enforcing any default, declaring that the Maturity Date is June 9, 2012 upon payment of the extension fee and that all maturity defaults to have been cured.

(h)    on the Eighth Cause of Action compelling for declaratory relief adjudicating that Capmark Bank's assignee or successor must accept a cure of payments and Extension Fee from Borrower or ODL to prevent default for Borrower or ODL or compelling a sale of Note A to Borrower or ODL as alleged in the Omni Litigation.

(i)    awarding to Plaintiff the costs and disbursements of this action, including attorneys' fees, and such other and further relief as this Court deems just and proper.

Dated: New York, New York
      June 1, 2011

           **WINDELS MARX LANE & MITTENDORF, LLP**

By: _____

            Mark Slama
            Tina Gagliano
            156 West 56th Street
            New York, New York 10019
            (212) 237-1000
            *Attorneys for Plaintiff*

## ATTORNEY'S VERIFICATION

MARK A. SLAMA, being duly sworn, affirms under CPLR 2016 and says that:

1.     I am a member of the bar of the State of New York and a member of the firm of Windels Marx Lane & Mittendorf, LLP, attorneys for Plaintiff, Fillmore East BS Finance Subsidiary LLC

2.     I have read the foregoing complaint and know the contents thereof. The same is true to my own knowledge and belief based upon my review of the Plaintiff's business records, loan documents, title reports and accounting records, except as to matters stated therein to be alleged upon information and belief, and as to those matters I believe them to be true.

3.     This verification is made by me as attorney for Fillmore because Fillmore's offices are not in the county in which attorneys for Fillmore maintain their offices.

Dated:  New York, New York
        June 1, 2011

By:    _____
              MARK A. SLAMA

FILED: NEW YORK COUNTY CLERK 06/22/2011

NYSCEF DOC. NO. 2

INDEX NO. 651502/2011

RECEIVED NYSCEF: 06/22/2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FILLMORE EAST BS FINANCE SUBSIDIARY LLC,

                  Plaintiff,

         -against-

CAPMARK BANK and TPR DOWNTOWN
INVESTMENTS, LLC,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: Index No. 651502-11
:
:
:
: **AFFIDAVIT OF SERVICE**
:
:
:
:
:
:

STATE OF NEW YORK    )
                      :ss.:
COUNTY OF NEW YORK    )

        GISELLE MENCIO, being duly sworn, deposes and says:

        I am employed by the firm of Windels Marx Lane & Mittendorf, LLP, attorneys for Plaintiff. I am over the age of eighteen years, and am not a party to the within action.

        On June 2, 2011, I served a true copy of the within **Summons and Verified Complaint** via First Class Certified Mail, return receipt requested, by depositing same in an official New York State depository under the exclusive care and custody of the United States Postal Service, securely sealed and in a postpaid wrapper, and by Federal Express, Priority Overnight, no signature required to the offices of:

                TPR Downtown Investments, LLC
                315 S. Biscayne Boulevard
                4th Floor
                Miami, FL 33131

                Capmark Bank
                6955 Union Park Center,
                Suite 330
                Midvale, UT 84047
                Attn: President

                Capmark Bank c/o
                Capmark Finance Inc
                116 Welsh Road
                Horsham, PA 19044
                Attn: Servicing Accounting - Manager

{10647091:1}

These being the addresses designated by said entities for that purpose upon preceding papers in this action.

_Giselle Mencio_
GISELLE MENCIO

Sworn to before me this
3rd day of June, 2011

_Idilia Rodgers_
Notary Public

IDILIA RODGERS
Notary Public , State of New York
No. 03-4678481
Qualified in Queens County
Commission Expires January 31, 20 _15_

{10487723;1}