UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILLMORE EAST BS FINANCE
SUBSIDIARY LLC,

                        Plaintiff,

        - against -

CAPMARK BANK,

                      Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 30, 2013

**MEMORANDUM**
**OPINION & ORDER**

11 Civ. 4491 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Fillmore East BS Finance Subsidiary LLC ("Fillmore") brings this action

against Capmark Bank ("Capmark") for breach of contract and a variety of torts based on

Capmark's alleged involvement in inducing the default of a loan for which the parties were co-

lenders.  Capmark has moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6),

arguing, inter alia, that Fillmore lacks standing, and that its breach of contract and tort claims

should be dismissed for insufficient pleading.[1]  For the reasons stated below, the Court concludes

that Fillmore has standing to bring its claims, but those claims as pleaded are defective.

Accordingly, Capmark's motion to dismiss will be granted.

---

[1] Capmark's motion to dismiss was, as to Counts 7 and 8, also brought under Federal Rule of
Civil Procedure 12(b)(7) – failure to join a party.  This aspect of Capmark's motion is now moot,
because these claims were dismissed on consent.  (Dkt. No. 34)

BACKGROUND[2]

I.      THE LOAN AGREEMENT AND PROMISSORY NOTES

On May 31, 2007, non-parties Downtown Miami Mall LLC and Downtown Miami Hotel LLC (together, the "Borrowers") entered into a loan agreement (the "Loan Agreement") with Defendant Capmark and Capmark Finance, Inc. ("CFI"). Capmark and CFI are co-lenders under the Loan Agreement and CFI is the agent for both. (Cmplt. ¶ 10) Pursuant to the Loan Agreement, the Borrowers obtained a commercial mortgage loan (the "Loan") in the original principal amount of $220 million. (Id. ¶ 11) The Loan was secured, in part, by a mortgage on real property in Miami, Florida, known as the Omni International Mall Complex (the "Mall Complex"), which consists of a hotel, and retail, and office space. (Id.)

The Loan Agreement includes a "Maturity Date" by which the Borrowers agreed to pay "the entire outstanding principal balance of the Loan, together with all accrued but unpaid interest thereon through the end of the then current Interest Accrual Period and all other amounts due under this Loan Agreement, the Note or any other Loan Document . . . ." (Id. ¶¶ 12-13) Under the Loan Agreement, the Borrowers could extend the Maturity Date for two additional one-year terms or through June 9, 2012, "upon proper notice and the payment of a fee equal to .125% of the then outstanding principal amount of the Loan (the "Extension Fee"), together with the satisfaction of certain other conditions . . . ." (Id. ¶ 15) Section 11.01(c) of the Loan Agreement provides that an "Event of Default" occurs "'if unpaid principal, accrued but unpaid

---

[2]  The following facts are drawn from "the complaint and any documents . . . incorporated by reference and 'documents upon which the complaint "relies heavily."'" Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y., 678 F.3d 184, 187 (2d Cir. 2012) (quoting In re Citigroup ERISA Litig., 662 F.3d 128, 135 (2d Cir. 2011) (quoting DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010))).

interest and all other amounts outstanding under the Loan Documents are not paid in full on or before the Maturity Date.'" (Id. ¶ 14)

The Loan is evidenced by two promissory notes:  Promissory Note A (the "Senior Note") and Promissory Note B (the "Junior Note").  (Id. ¶ 16)  At all relevant times, Capmark held the Senior Note.  (Id. ¶ 17)  After a series of assignments, Fillmore obtained the Junior Note on April 18, 2008.  (Id. ¶ 19)

## II.     THE SERVICING AGREEMENT

On May 31, 2007, Capmark and CFI, as co-lenders, entered into a Co-Lending and Servicing Agreement (the "Servicing Agreement").  (Id. ¶ 21)  Pursuant to Section 2(a) of the Servicing Agreement, CFI was appointed to act as the servicer of the loan.  (Id. ¶ 22)  As such, CFI was

> authorized to act on behalf and for the benefit of the Co-Lenders and Agent, to administer, manage, and service the Loan and collect payments under the Loan and enforce the Loan Documents in a manner consistent with this Agreement, all applicable laws and the Servicing Standard; to receive all payments on the Loan, to exercise all other powers granted to Servicer in this Agreement; and to exercise all such powers as are incidental or necessary to any of the foregoing.

(Id.)  The Servicing Standard in the Servicing Agreement requires the Servicer to act "in the best interests of the Co-Lenders (taking into account the relative priority of [the Senior Note] and [the Junior Note]" "with a view to the maximization of timely recovery of principal and interest on the Loan, but without regard to . . . the ownership of any interest in the Loan by Servicer or any Affiliate of Servicer."  (Id. ¶ 25)

## III.    THE DEFAULT

Fillmore alleges that, in the Spring of 2010, the Borrowers were "ready, willing, and able" to provide the requisite notice and pay the Extension Fee in order to extend the Maturity Date by one year and avoid defaulting on the Loan.  (Id. ¶ 30)  Fillmore further claims

that Capmark "took action designed to induce [the] Borrower[s] to refrain from, and avoid paying, the Extension Fee thereby causing the Loan to go into default."  (Id. ¶ 31)  Specifically, Fillmore alleges that Capmark and CFI "engaged in numerous restructuring discussions with the Borrower[s] prior to the Maturity Date, which included proposals reducing the principal amount of the Loan and the provision of payments to the Borrower[s]" from monies that would otherwise be paid to Fillmore.  (Id. ¶ 32)  During these discussions, Capmark and CFI "advised [the] Borrower[s] that upon the expiration of a sixty (60) day time period after the scheduled Maturity Date, Fillmore would no longer need to be involved in any decision-making concerning the restructuring of the Loan and, further, that Capmark . . . would have greater flexibility to restructure the Loan if the Loan went into default rather than be[ ] extended."  (Id. ¶ 33)

On May 14, 2010, Capmark advised Fillmore that the Borrowers were "unlikely" to pay the Extension Fee and that Capmark was "unlikely" to extend the Maturity Date of the Loan.  (Id. ¶ 34)  Nevertheless, it "appeared [to Fillmore] that [the] Borrower[s] had every incentive to extend the Loan," given that they had obtained leaseholds at the Mall Complex which increased its value and generated cash flow.  (Id. ¶ 38)

On May 28, 2010, CFI provided a term sheet (the "Term Sheet") to Fillmore regarding a potential restructuring of the Loan.  (Id. ¶ 35)  The Term Sheet contained "proposals by [CFI] and Capmark whereby [certain] payments would be made to the 'defaulting' Borrower[s] prior to payments being made to Fillmore."  (Id. ¶ 36)  Prior to receiving the Term Sheet, Fillmore had spent more than $19 million to support and benefit the Mall Complex.  (Id. ¶ 37)

On June 11, 2010, CFI declared the Borrowers in default of the Loan.  (Id. ¶ 42) Fillmore alleges that Capmark and CFI "willfully induced [the] Borrower[s] not to extend the

Maturity Date and allow the Loan to go into default by reason of the promises and financial incentives they offered to [the] Borrower[s] on the condition that [the] Borrower[s] not exercise [their] contractual remedies to extend the Maturity Date." (Id. ¶ 40)  Fillmore further claims that "based upon Capmark['s] . . . [and CFI's] misleading representations and inducements, [the] Borrower[s] did not extend the Maturity Date of the Loan, relying upon Capmark . . . [and CFI's] misrepresentations and false promises that a restructuring would promptly occur after the Maturity Date expired on June 9, 2010." (Id. ¶ 41)

On June 22, 2010, Fillmore provided Capmark and CFI with a proposed restructuring of the Loan and, during the summer of 2010, Fillmore, Capmark, and CFI conducted negotiations regarding a potential restructuring. (Id. ¶ 43)  During this period, Fillmore was the "Controlling Holder" of the Loan – as defined in the Servicing Agreement – and no major decisions concerning the Loan could be made without Fillmore's approval. (Id.) On August 18, 2010, Capmark entered into a Pre Negotiation Agreement (the "PNA") with Fillmore, in which it represented that it would continue negotiating with Fillmore in good faith to restructure the Loan. (Id. at ¶ 44)  The PNA provided, however, that either party could terminate the negotiations at any time:

> Any party to this letter agreement may terminate the negotiations at any time, for any reason, in such party's sole and absolute discretion, with or without prior notice to the other parties.  No party is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to the Loan or any other matter. . . . The parties agree that no negotiation or other action undertaken pursuant to this letter agreement shall constitute a waiver of any party's rights as to any other party or under the [Servicing Agreement].

(Feder Aff., Ex. 3 ¶¶ 1, 4)

IV.   **SALE OF THE SENIOR NOTE TO TPR**

On August 27, 2010, CFI, as Servicer, advised Fillmore that a "Control Appraisal Period" had commenced and that, as a result, Fillmore's consent was no longer required to restructure the Loan.  (Cmplt. ¶ 45)  In early September 2010, Capmark decided to sell its interests in the Senior Note and to end restructuring negotiations with Fillmore.  (Id. ¶ 46) Capmark hired a broker to sell the Senior Note without any input from Fillmore.  (Id.)  These actions "came as a complete surprise to Fillmore[,] as Capmark . . . had previously said [it] would negotiate a restructure term sheet simultaneously with the sale evaluation process[,] which is why Capmark  . . . and Fillmore entered into the PNA."  (Id.)

The Complaint alleges that Capmark acknowledged in early 2010 that the Borrowers were the only realistic purchaser of the Senior Note and, accordingly, Capmark agreed to provide the Borrowers with a "last look," whereby the Borrowers would have the opportunity to match the best offer to purchase the Senior Note.  (Id. ¶ 48)  In exchange for the "last look," the Borrowers agreed to assist Capmark in its efforts to value the Senior Note and the Mall Complex.  (Id.)  Borrowers and their affiliate, Omni Development LLC, repeatedly expressed a desire to retain the Loan and restructure it in a manner acceptable to both lenders and to avoid foreclosure.  (Id. ¶¶ 51-52)  However, Capmark sold the Senior Note to TPR Downtown Investments LLC ("TPR") at a substantial discount.  (Id. ¶ 50)  Fillmore alleges that TPR intends "to liquidate the collateral for the Loan and cause a foreclosure sale to occur at a distressed price resulting in no recovery for Fillmore, but which will yield a windfall for the holder of [the Senior Note]."  (Id.)

## V.   SALE OF THE NOTES TO HILL BROW LLC

On August 26, 2011, Fillmore sold the Junior note to non-party SFI Biscayne Boulevard Acquisitions LLC ("SFI").  (Slama Aff., Exs. G, H)  Notwithstanding the fact that SFI purchased and assumed "a 100% interest in [the Junior Note] and to all of [Fillmore's] rights and obligations under the [Loan Agreement and Servicing Agreement]," Fillmore and SFI agreed that Fillmore "retain[s] all rights, title and interest to the litigation whose caption is Fillmore East BS Finance Subsidiary LLC v. Capmark Bank et al., Case Number: 1:11-cv-04491-PGG pending in the U.S. District Court in the Southern District of New York" and, inter alia, to all damages arising from the litigation.  (Id., Ex. H)  SFI subsequently sold the Junior Note to Hill Brow LLC ("Hill Brow").  TPR also sold the Senior Note to Hill Brow, such that Hill Brow now owns both the Junior and Senior Notes.  (See Feder Aff., Ex. 6)

## VI.   PROCEDURAL POSTURE

On June 1, 2011, Fillmore filed suit against Capmark and TPR in the Supreme Court of the State of New York, New York County (Fillmore East BS Finance Subsidiary LLC v. Capmark Bank, Index No. 651502/2011), asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty and aiding and abetting such breach, tortious interference with contract, gross negligence, and willful misconduct. Fillmore alleges that as a result of Capmark's inducing the Borrowers' default, and sale of the Senior Note to TPR, Fillmore will not recover any of the funds owed to it under the Junior Note. (Cmplt. ¶ 60)

On June 30, 2011, TPR filed a Notice of Removal.  (Dkt. No. 1)  On September 16, 2011, Fillmore voluntarily dismissed its claims against TPR.  (Dkt. No. 16)

Capmark's moved to dismiss on November 15, 2011.  (Dkt. No. 23)   After

Fillmore filed opposition papers and Capmark filed a reply, on August 29, 2012, the Court

ordered that the parties submit supplemental briefing addressing, <u>inter alia</u>, Fillmore's standing

to bring this action.  (Dkt. No. 35)  In accordance with the August 29, 2012 order, Fillmore and

Capmark filed supplemental briefs on September 6, 2012 and September 12, 2012, respectively.

## DISCUSSION

## I.     LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   <u>Ashcroft v.</u>

<u>Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).

"In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the

complaint," <u>Kassner v. 2nd Ave. Delicatessen, Inc.</u>, 496 F.3d 229, 237 (2d Cir. 2007) (citing

<u>Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals</u>, 282 F.3d 83, 87 (2d Cir. 2002)),

and must "draw all reasonable inferences in favor of the plaintiff."   <u>Id.</u> (citing <u>Fernandez v.</u>

<u>Chertoff</u>, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'"  <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests."  <u>Port Dock & Stone Corp. v. Oldcastle Ne., Inc.</u>, 507

F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 555).

## II.     FILLMORE HAS STANDING TO BRING ITS CLAIMS

Capmark argues that Fillmore lacks standing to bring this action.  "The doctrine

of standing asks whether a litigant is entitled to have a federal court resolve his grievance.  This

inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" Kowalski v. Tesmer, 543 U.S. 125, 128-29 (2004) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)).  With regard to prudential considerations, courts "have adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" Id. at 129 (quoting Warth, 422 U.S. at 499).  In addition, "Article III, Section 2 of the Constitution limits the jurisdiction of the federal courts to the resolution of 'cases' and 'controversies.'" Mahon v. Ticor Title Ins. Co., 683 F.3d 59, 62 (2d Cir. 2012) (citation and internal quotation marks omitted).  "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." Id. (quoting Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC, 433 F.3d 181, 198 (2d Cir. 2005).  "To satisfy the '"irreducible constitutional minimum" of standing,' a plaintiff must demonstrate (1) a personal injury in fact (2) that the challenged conduct of the defendant caused and (3) which a favorable decision will likely redress."  Id. (quoting Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev., 651 F.3d 218, 228 (2d Cir. 2011) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992))).  "'[A] plaintiff must demonstrate standing for each claim and form of relief sought.'"  Carver v. City of N.Y., 621 F.3d 221, 225 (2d Cir. 2010) (quoting Baur v. Veneman, 352 F.3d 625, 642 n.15 (2d Cir. 2003)).

When one party challenges standing, "the Court may look to affidavits and other evidence outside the pleadings to resolve disputed jurisdictional fact issues." E. Paralyzed Veterans Ass'n v. Lazarus–Burman Assocs., 133 F. Supp. 2d 203, 208 (E.D.N.Y. 2001); cf. Warth, 422 U.S. at 501 (1975) ("[I]t is within the trial court's power to allow or to require the

plaintiff to supply, by amendment to the complaint or by affidavits, further particularized

allegations of fact deemed supportive of plaintiff's standing.").

        In arguing that Fillmore's claims should be dismissed for lack of standing,

Capmark contends that Fillmore is attempting to assert the rights of third parties, in particular,

the Borrowers.  (Def. Supp. Br. 2-6, 8-9)  Put another way, Capmark argues that Fillmore's

claims pertain to harms suffered by the Borrowers, and not by Fillmore.  (Def. Br. 8-9)  Capmark

further argues that Fillmore has not demonstrated that it suffered an injury in fact, because the

alleged lost interest payments and depreciation of the Junior Note are hypothetical and

speculative in nature.  (Def. Supp. Br. 4 n.6, 6-8)  Finally, Capmark argues that Fillmore's

alleged injuries cannot be redressed, because both the Senior and Junior Notes have been sold to

non-parties over which Capmark has no control.  (Def. Br. 10)

### A.    **Third Party Standing**

        Capmark first argues that "Fillmore's Complaint rests on purported contractual

rights belonging to the defaulted Borrowers[,] and Fillmore cannot satisfy the standards to

overcome the rule against third party standing in federal court."  (Def. Supp. Br. 1; see also id. at

5-6)  "As an aspect of justiciability, standing asks whether the plaintiff has '"alleged such a

personal stake in the outcome of the controversy" as to warrant his invocation of federal-court

jurisdiction and to justify exercise of the court's remedial powers on his behalf.'"  N.Y. County

Lawyers' Ass'n v. Bloomberg, No. 10 CV. 5035(DAB), 2011 WL 4444185, at *4 (S.D.N.Y.

Sept. 23, 2011) (quoting Warth, 422 U.S. at 498-99 (quoting Baker v. Carr, 369 U.S. 186, 204

(1962))).  "Accordingly, the doctrine bars plaintiffs who do not assert harm to their own

interests."  Id.  A limited exception to this rule exists when "the party asserting the right has a

'close' relationship with the person who possesses the right," and when "there is a 'hindrance' to the possessor's ability to protect his own interests." Kowalski, 543 U.S. at 129-130.

> According to Capmark, Fillmore's
>
> claims rely on the assertion of nonparty rights, specifically: (i) the Borrowers' contractual right to extend the term of the Loan, and (ii) the Borrowers' and/or Borrowers' affiliate Omni's purported right of first refusal to purchase the Senior Note. Although the exercise of either right by the nonparty could have indirectly affected Fillmore's economic position by virtue of the lender-borrower relationship, they implicate rights only of nonparties."

(Def. Supp. Br. 3 (emphasis in original))

Capmark's arguments are not persuasive. Fillmore's claims do not depend on the Borrowers' rights, but on Fillmore's own right to collect on the Junior Note in the normal course of business without undue interference by Capmark. As pleaded in the Complaint, Fillmore was a party to a Promissory Note, which entitled Fillmore to collect all outstanding principal and accrued interest on the Junior Note as of the Maturity Date set in the Loan Agreement, whether as originally scheduled on June 9, 2012 or at the end of two possible one-year extensions. (Cmplt. ¶¶ 10-15, 18-19) Fillmore was also party to a Servicing Agreement, which entitled it to rely on the Servicer to service the Junior Note "in the best interests of the Co-Lenders" and "with a view to the maximization of timely recovery of principal and interest on the Loan." (Cmplt. ¶¶ 21, 25) The Complaint contends that "[b]y inducing Borrower to default on the Loan based on promises and representations, which were misleading and false, Defendant Capmark . . . and its alter ego [CFI] breached contractual obligations owed to Fillmore." (Cmplt. ¶ 65 (emphasis added)) The Complaint contains myriad similar allegations of Capmark's interference with Fillmore's rights.[3] In short, Fillmore has "assert[ed its] own legal rights and interests" and

---

[3] See Cmplt. ¶ 72 ("Defendant Capmark . . . and its affiliate [CFI] conspired with one another to devise a common scheme and plan to impair and diminish Fillmore's rights in the collateral and

does not "rest [its] claim to relief on the legal rights or interests of third parties." Kowalski, 543 U.S. at 129 (quoting Warth, 422 U.S. at 499).

Capmark further argues that "Fillmore's complete assignment of its Junior Note position . . . strips Fillmore of its status as a real party in interest for purposes of standing." (Def. Supp. Br. 1)  According to Capmark, "Fillmore's claims of injury rest on alleged impairment of the Junior Note," and because Fillmore sold the Junior Note, "any alleged harm . . . will be suffered by [the] nonparty [new note holder] and not by Fillmore."[4]  (Def. Supp. Br. 8-9)

When Fillmore assigned the Junior Note, however, it expressly "retain[ed] all right, title and interest to [this] litigation . . . , together with all claims . . . and causes of action whatsoever . . . in connection with [this litigation]."  (Slama Aff., Ex. H at 1)  Capmark has cited no case suggesting that Fillmore cannot proceed with its claims under these circumstances.  As a general matter, a property owner is free to transfer all or only part of the rights associated with a piece of property, and the courts have long permitted legal rights to be asserted by entities or

---

Note B in contravention of their respective contractual and fiduciary obligations (emphasis added)); id. ¶ 74 ("Defendant Capmark . . . acted in bad faith, and sought to prevent Fillmore from receiving the benefits contracted for in the Loan Agreement, the Servicing Agreement, [the Junior Note], and related Loan documents . . . ." (emphasis added)); id. ¶ 75 ("Capmark['s] unjustifiable hindrance of Fillmore's ability to receive the benefits contracted for in the Loan Agreement, the Servicing Agreement, [the Junior Note], and related Loan documents , constitutes a breach of the covenant of good faith and fair dealing (emphasis added)); id. ¶ 81 ("[CFI] breached fiduciary duties owed to Fillmore" (emphasis added)); id. ¶ 88 ("Capmark['s] and [CFI's] actions inducing Borrower to breach the Loan Agreement were designed to injure Fillmore . . . ." (emphasis added)); id. ¶ 94 ("[CFI] . . . egregiously breach[ed] the duty of care to Fillmore . . . [and] disregarded its duties and obligations to Fillmore . . . ." (emphasis added)); id. ¶ 95 ("Capmark . . . act[ed] carelessly and with reckless disregard as to Fillmore's rights under [the Loan] agreements . . . ." (emphasis added)); id. ¶ 100 ("Capmark . . . intentionally induced Borrower to default on the Loan with the intention of benefiting Capmark . . . to the detriment of Fillmore and its interest in the Loan . . . ." (emphasis added)).

[4]  On August 26, 2011, Fillmore sold the Junior Note to SFI Biscayne Boulevard Acquisitions LLC, which thereafter sold the Junior Note to Hill Brow, LLC.  (Slama Aff., Exs. G, H; Feder Aff., Ex. 6)  Capmark argues that Hill Brow is the real party in interest because it is the current owner of the Junior Note.  (See Def. Supp. Br. 8-9)

individuals that do not hold a complete interest in the underlying property.  See, e.g., Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 285 (2008) ("Lawsuits by assignees, including assignees for collection only, are cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process." (internal quotation omitted)); Conn. v. Physicians Health Servs. of Conn., 287 F.3d 110, 115-16 & n.6 (2d Cir. 2002) (recognizing that "a valid and binding assignment of a claim (or a portion thereof . . . may confer standing on the assignee").  Accordingly, Fillmore retained standing to bring this suit when it otherwise assigned the Junior Note.[5]

### B.   Injury in Fact

"Injury-in-fact is an indispensable requirement for standing."  Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 174 (2d Cir. 2005).  "To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be 'concrete and particularized' as well as 'actual or imminent, not "conjectural" or "hypothetical."'"  Baur, 352 F.3d 625, 632 (2d Cir. 2003) (quoting Lujan, 504 U.S. at 560).  "[I]n evaluating whether the alleged injury is concrete and particularized, [a court must] assess whether the injury 'affect[s] the plaintiff in a personal and individual way'. . . ."  Id. (quoting Lujan, 504 U.S. at 560 n.1).

---

[5]  Fillmore also argues that its standing is not affected by the assignment of the Junior Note, which occurred after this action was filed, because a "party's standing is determined as of the commencement of the action."  (Pltf. Supp. Br. 3)  Fillmore misunderstands this principal, which merely prevents a party from retroactively creating standing after a suit is filed.  Clarex Ltd. v. Natixis Secs. Am. LLC, No. 12 Civ. 0722(PAE), 2012 WL 4849146, at *4 (S.D.N.Y. Oct. 12, 2012) ("It is axiomatic . . . that 'standing is to be determined as of the commencement of suit.'  Because lack of standing is a jurisdictional defect, a corollary of this rule is that courts cannot consider any amendments to the initial complaint or any post-filing assignments to plaintiffs to determine whether plaintiffs have standing."  (quoting Fenstermaker v. Obama, 354 F. App'x 452 455 n.1 (2d Cir. 2009)) (citing Lujan, 504 U.S. at 571 n.5) (other internal citations omitted)).  A party with standing at the commencement of a suit is not immunized from challenges to its standing should the facts supporting the party's standing subsequently change.  Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249, 255 (1994) ("Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation.").

"Likewise, the requirement of concrete injury recognizes that if an injury is too abstract, the plaintiff's claim may not be capable of, or otherwise suitable for, judicial resolution." Id. (citing Raines v. Byrd, 521 U.S. at 811, 819 (1997)).  "Similarly, to support standing, the plaintiff's injury must be actual or imminent to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur." Id. (citing Lujan, 504 U.S. at 564-65 n.2 (noting that "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is certainly impending") (internal quotation marks omitted)).

Here, the Complaint alleges that "Capmark . . . and its agent and alter ego directly and proximately injured Fillmore, because Fillmore's ability to recover monies owed it under [the Junior Note] as a result of the default has been diminished, impaired and possibly vitiated." (Cmplt. ¶ 67)  Such economic injuries took two forms:  (1) "Fillmore lost two years of interest payments totaling approximately $4 million"; and (2) "the value of [the Junior Note] was severely diminished."  (Pltf. Supp. Br. 6; see Cmplt. ¶ 60 ("Fillmore will likely be unable to recover any of the funds owed to it under [the Junior Note] and its economic position has been materially impaired. . . ."); Slama Aff., Ex. B § 2.02 (Calculation of Interest)))

Capmark nonetheless argues that Fillmore has not demonstrated an injury in fact, because its "claims rest on alleged harms suffered by [the] Borrowers" rather than harm suffered by Fillmore.  (Def. Br. 8)  Capmark mischaracterizes Fillmore's Complaint, which alleges that Capmark "hampered and interfered with Fillmore's anticipated benefits" under the Junior Note. (Cmplt. ¶ 75 (emphasis added))  Fillmore's alleged inability to collect on the amounts due to it under the Junior Note is a sufficiently particularized and personal injury to Fillmore.  Contrary to

Capmark's argument (Def. Supp. Br. 3), Fillmore is not deprived of standing because Capmark inflicted this injury on Fillmore indirectly by inducing Borrowers to default on the Junior Note. See Garelick v. Sullivan, 987 F.2d 913, 919 (2d Cir. 1993) ("A plaintiff does not lack standing merely because her injury is an indirect product of the defendant's conduct.").

Capmark further argues that Fillmore's alleged injuries are "merely speculative or hypothetical," because "Fillmore's claim for lost interest . . . depend[s] on what Borrower might have done" with regard to its right to extend the Maturity Date and thereby avoid default.  (Def. Supp. Br. 4 n.6, 6 (emphasis in original))  This argument is unavailing.  A hypothetical injury is one where "the projected harm may ultimately fail to occur," see Baur, 352 F.3d at 632, because it is "depend[ent] on the course of future events."  Port Wash. Teachers' Ass'n v. Board of Educ. of Port Wash. Union Free Sch. Dist., 478 F.3d 494, 502 (2d Cir. 2007).  Here, Fillmore's inability to collect the interest payments is not contingent on any future event.  As pleaded in the Complaint, the Borrowers were required to, but did not, pay Fillmore "all accrued but unpaid interest" on the Maturity Date, June 9, 2012.  (Cmplt. ¶ 12-14, 42)  This date passed without payment by the Borrowers, thus causing a tangible injury to Fillmore.  The possibility that the Borrowers might have exercised their right to extend the Maturity Date and forestall the injury to Fillmore is irrelevant, because the Borrowers did not do so.

Capmark also argues that "Fillmore's complete assignment of its Junior Note position renders hypothetical any potential injury predicated on a diminution in value . . . ." (Def. Supp. Br. 1)  According to Capmark, "[b]ecause Fillmore sold the Junior Note prior to any foreclosure sale, the injury is hypothetical; we simply cannot know what the property would have sold for, and, as a result, what Fillmore's recovery on the Note would have been."  (Def. Supp. Br. 7)  This argument is nonsensical.  Fillmore's sale of the Junior Note makes the

diminution in value of the Note more, not less, concrete.[6]  One can simply compare the difference in the face value of the Note and the price for which Fillmore sold it.  Moreover, even if Fillmore had not sold the Junior Note, the diminution in value of an asset or the loss of a market in which to sell that asset may constitute a sufficiently concrete injury in fact for the purpose of standing.  See, e.g., Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 115 (1979) ("[C]onvincing evidence that the economic value of one's home has declined as a result of the conduct of another certainly is sufficient under Art. III to allow standing to contest the legality of that conduct."); In re Alstom SA Securities Litigation, 253 F.R.D. 266, 274 (S.D.N.Y. 2008) ("Plaintiffs, who held equity interests in Alstom, allege that Alstom lost approximately 93 percent of its market capitalization over the Proposed Class Period, which sufficiently demonstrates an injury in fact."); Feiner Family Trust v. VBI Corp., No. 07 Civ.1914(RPP), 2007 WL 2615448, at *4 (S.D.N.Y. Sept. 11, 2007). ("Here[,] Plaintiff's claim that Defendants' alleged fraudulent conduct deprived Plaintiff of any market for its stock is not conjecture or hypothetical.  Instead, it is actual and sufficiently concrete to constitute an injury in fact and satisfy Article III's 'case or controversy' requirement.").  The fact that Fillmore will be required to quantify this injury with more specificity later in this litigation is of no consequence.  At the motion to dismiss stage, it is enough that Fillmore has pleaded facts sufficient to demonstrate that "its economic position has been materially impaired by reason of [Capmark's] misconduct. . . ."  (Cmplt. ¶ 60)

---

[6]  The RICO case cited by Capmark is inapposite.  (Def. Supp. Br. 8)  First, it pertains to the statutory requirements for standing under RICO, not constitutional standing.  See First Central Savings Bank v. Meridian Residential Capital, No. 09 Civ. 3444 (DLI) (LB), 2011 WL 838910, at *3 (E.D.N.Y Mar. 3, 2011) ("As a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite.") (emphasis added) (internal alteration and quotation omitted).  Second, the case supports the proposition that Fillmore's sale of the Junior Note makes its injury more, not less, concrete.  See id. ("[T]he actual loss becomes clear and definite only when the property is sold.").

C.   **Redressability**

Finally, Capmark contends that "because Fillmore and Capmark have sold their respective notes, the alleged injuries suffered cannot be redressed by the relief sought because no party to the case controls the actions of non-parties like the Borrowers or Hill Brow."  (Def. Br. 8)  Capmark argues that it "has no control over Hill Brow or the Borrowers such that it could compel Borrowers to pay an Extension Fee or mandate that Hill Brow accept such a fee or, in the alternative, sell the Senior Note to the Borrowers."  (Def. Br. 10)  This argument has no merit.

Having voluntarily dismissed the Complaint's seventh and eighth causes of action (Dkt. No. 34), Fillmore now seeks only monetary remedies.  As Fillmore argues, "ownership of the notes is irrelevant, as Fillmore may be compensated for the money damages it suffered prior to the sale of the Note."  (Pltf. Br. 26)  See, e.g., Lujan v. Cabana Mmgt., Inc., No. 10 Civ. 0755 (ILG),  2010 WL 5391462, at *3 (E.D.N.Y. Dec. 22, 2010) ("The Plaintiff seeks monetary damages for the economic harms he suffered, meeting the redressability prong.") (citing Wernsing v. Thompson, 423 F.3d 732, 745 (7th Cir. 2005) ("[I]njuries compensable in monetary damages can always be redressed by a court judgment.")).

III.   **FILLMORE HAS FAILED TO STATE A CLAIM**

Having determined that Fillmore has sufficiently alleged standing to bring this action, the Court must now consider whether Fillmore has failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).  For the reasons stated below, none of Fillmore's claims meet the Rule 12(b)(6) standard.

A.   **Breach of Contract**

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the

contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco

Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996) (citing Tagare v. Nynex Network Sys. Co., 921

F. Supp. 1146, 1149 (S.D.N.Y. 1996)).  Fillmore's breach claims pertain to two contracts:  the

Servicing Agreement and the oral "last look" agreement.

           1.    **Servicing Agreement**

With regard to the Servicing Agreement, the Complaint pleads facts making out

the first, second, and fourth elements of a breach of contract claim.  The Complaint identifies the

Servicing Agreement as the breached contract (Cmplt. ¶ 62), states that "Fillmore fully

performed its obligations under the Servicing Agreement (id. ¶ 63), and alleges that "[t]he breach

of the Servicing Agreement . . . proximately injured Fillmore, because Fillmore's ability to

recover the monies owed it under [the Junior Note] as a result of the default has been diminished,

impaired and possibly vitiated."  (Id. ¶ 67)  However, the Complaint fails to adequately allege

that Capmark breached the Servicing Agreement.

As alleged in the Complaint, CFI was the Servicer named in the Servicing

Agreement.  (Id. ¶ 22)  As such, CFI had a duty to act in accordance with the Servicing Standard

provision of the Servicing Agreement.  (Id. ¶ 25)  Fillmore does not allege that Capmark owed it

any duties under the Servicing Agreement.  Instead, Fillmore alleges that CFI is the alter ego of

Capmark, thereby suggesting that Capmark should be held liable for CFI's breach of the

Servicing Agreement.  (See id. ¶¶ 62-63)

Capmark argues that the Complaint does not plead facts demonstrating that CFI is

an alter ego of Capmark.  (Def. Br. 12)  Because this is a diversity case, the Court will "apply

the choice of law rules of the forum state – in this case New York – to determine what law

governs [the] alter ego . . . analysis."  Am. Fuel Corp. v. Utah Energy Dev. Co., Inc., 122 F.3d

130, 134 (2d Cir. 1997)  "'Under New York choice of law principles, "the law of the state of incorporation determines when the corporate form will be disregarded."'" <u>Air Atlanta Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC</u>, 637 F. Supp. 2d 185, 200 (S.D.N.Y. 2009) (quoting <u>Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. Alliance, Inc.</u>, No. 05 Civ. 7776, 2007 WL 1701813, at *7 (S.D.N.Y. June 12, 2007) (quoting <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1456 (2d Cir. 1995))).  Because CFI is a California corporation (Cmplt. ¶ 3), the Court will apply California law to determine whether to disregard CFI's corporate form and hold Capmark liable. <u>See</u> <u>Ligotti v. Provident Life & Cas. Ins. Co.</u>, 857 F. Supp. 2d 307, 314-15 (W.D.N.Y. 2011) ("Plaintiff, by asserting her breach of contract claim against Unum as the parent company of Provident, essentially seeks to pierce Provident's corporate veil in order to hold Unum liable for Provident's alleged breach of the insurance policy. . . . Provident is a Tennessee corporation and, thus, Tennessee law determines whether Provident's corporate veil can be pierced.").

"Under California law, to state a prima facie case of alter ego liability, a plaintiff must show that (1) that there is such unity of interest and ownership that the separate personalities of [the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." <u>Impulse Mktg.</u>, 2007 WL 1701813, at *8 (citing <u>AT & T v. Compagnie Bruxelles Lambert</u>, 94 F.3d 586, 591 (9th Cir. 1996) (internal quotations omitted).

> Courts are to consider a number of factors in assessing whether alter ego liability is proper, such as:  (1) commingling of funds and other assets; (2) holding out by one entity that is liable for the debts of another; (3) identical equitable ownership of the two companies; (4) use of the same offices and employees; (5) use of one company as a mere shell for the other; (6) inadequate capitalization; (7) lack of segregation of corporate records; and (8) identical directors and officers.

<u>Id.</u> (citing <u>Miller v. IBM Corp.</u>, No. C02-2118, 2006 WL 2792416, at *5 (N.D. Cal. Sept. 26, 2006)).  "Conclusory allegations of 'alter ego' status are insufficient to state a claim.  Rather, a

plaintiff must allege specifically both of the elements of alter ego liability, as well as facts

supporting each."  Neilson v. Union Bank of Ca., N.A., 290 F. Supp. 2d 1101, 1116 (C.D. Cal.

2003) (analyzing alter ego liability under California law) (citing In re Currency Conversion Fee

Antitrust Litig., 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003)).[7]

          In support of its alter ego theory, Fillmore alleges

> [u]pon information and belief, Capmark . . . and [CFI] share common ownership,
> employees, management, and engaged in common decision making with respect
> to the matters set forth in this Complaint so that there is no real distinction in fact
> between one another with respect to the matter before the Court in this action.

(Cmplt. ¶ 6)  Fillmore further alleges that Capmark "took control of [CFI], a bankrupt entity, in a

manner which diminished [CFI's] ability to make independent and unbiased decisions so as to

act at the direction and for the benefit of Capmark."  (Cmplt. ¶ 63)

          Fillmore has offered no facts in support of these allegations, however.  As

Capmark argues, Fillmore "fails to even identify the allegedly common owners, management and

employees of the two companies."  (Def. Br. 13-14)  The Complaint's "purely conclusory

allegations cannot suffice to state a claim based on veil-piercing or alter-ego liability, even under

the liberal notice pleading standard."  In re Currency Conversion Fee Antitrust Litig., 265 F.

Supp. 2d at 426 (holding that plaintiff failed to state a claim based on alter ego liability when it

alleged only that a company "exercised such dominion and control over its subsidiaries . . . that it

is liable according to the law for the acts of such subsidiaries under the facts alleged in this

---

[7]  This pleading standard is entirely consistent with Fed. R. Civ. P. 8 as interpreted by the
Supreme Court.  See Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not suffice."); Port Dock & Stone Corp. v.
Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("The plaintiff's factual allegations must be
enough to give the defendant fair notice of what the claim is and the grounds upon which it
rests.") (citing Twombly, 550 U.S. at 555).

Complaint").[8]  Accordingly, Fillmore has failed to state a claim for breach of the Servicing

Agreement by Capmark.

**2.**    <u>**Last Look Agreement**</u>

The Complaint also alleges that Capmark "agreed to provide the Borrower with a

last look, or the ability to match the best offer to purchase [the Senior Note]" (Cmplt. ¶ 48), and

that Capmark's breach of this oral agreement violated the Servicing Agreement.  (<u>Id.</u> ¶ 65)

Fillmore does not allege that it was a party to the "last look" agreement, but rather  that it "was

intended to also benefit Fillmore and the [Junior Note] position."  (<u>Id.</u> ¶ 65)

Under New York law, a plaintiff claiming rights as a third-party beneficiary must

demonstrate: "(1) the existence of a valid and binding contract between other parties, (2) that the

contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate,

rather than incidental, to indicate the assumption by the contracting parties of a duty to

compensate him if the benefit is lost."  <u>State of Ca. Pub. Emps. Ret. Sys. v. Shearman & Sterling</u>,

95 N.Y.2d 427, 434-35 (2000) (internal quotation marks omitted).

Capmark argues that "[e]ven assuming <u>arguendo</u> the validity of the alleged oral

agreement, Fillmore has failed to allege that the alleged oral agreement was intended for

Fillmore's immediate benefit."  (Def. Br. 9)  The Court agrees.  The "naked assertion" in

---

[8]  The cases cited by Fillmore are not on point.  In <u>Network Enterprises, Inc. v. APBA Offshore
Productions Inc.</u>, No. 01 Civ. 11765 (CSH), 2002 WL 31050846, at *4 (S.D.N.Y. Sept. 12,
2002), the proposed amended complaint pleaded that the alleged alter ego shared the same
address and telephone number as the named defendant, that he was chairman of the named
defendant, that he exercised complete dominion over the named defendant in connection with the
transaction at issue, and that he sent the letter effecting the alleged breach of contract.  Fillmore
has alleged no such facts here.  Likewise, in <u>Rolls-Royce Motor Cars Inc. v. Schudroff</u>, 929 F.
Supp. 117, 122 (S.D.N.Y. 1996), the Court held that the plaintiff "alleged the <u>fact</u> of complete
domination and the use of that domination to commit a wrong against creditors."  <u>See also</u> <u>EED
Holdings v. Palmer Johnson Acquisition Corp.</u>, 387 F. Supp. 2d 265, 274 n.4 (S.D.N.Y. 2004)
(distinguishing cases where "the court's refusal to dismiss a veil-piercing claim was based on its
determination that sufficient facts, and not mere conclusions, had been alleged").

paragraph 65 of the Complaint that the oral agreement was intended to benefit Fillmore is not

sufficient to survive a motion to dismiss.  See Twombly, 550 U.S. at 570.  At no point in its

description of the oral agreement does Fillmore allege facts to suggest that the Borrowers and

Capmark entered into the agreement for Fillmore's benefit.  (See Cmplt. ¶¶ 46-52, 65)  Indeed,

the Complaint alleges that Capmark's efforts to sell the Senior Note occurred "without any input

or consultation from Fillmore."  (Id. ¶ 46)  Accordingly, any claims based on breach of the

alleged "last look" agreement between the Borrowers and Capmark will be dismissed.

### B.    Breach of Covenant of Good Faith and Fair Dealing

Fillmore brings a separate cause of action for breach of the covenant of good faith

and fair dealing.  (Id. ¶¶ 70-77)  "Under New York law, implicit in all contracts is a covenant of

good faith and fair dealing in the course of the contract performance."  DBT Gmbh v. J.L.

Mining Co., 544 F. Supp. 2d 364, 384 (S.D.N.Y. 2008) (internal quotation marks omitted).  The

Complaint alleges that Capmark and CFI breached this covenant by inducing the Borrowers to

default on the Junior Note and breaching the last look agreement, and thereby "hampered and

interfered with Fillmore's anticipated benefits" under the Loan documents.  (Id. ¶¶ 72, 73, 75)

This claim fails for several reasons.

First, this claim is duplicative of Fillmore's breach of contract claim.  "New York

law requires dismissal of an implied covenant claim where the claim derives from the same set of

facts as a breach of contract claim."  FCOF UB Sec. LLC v. MorEquity, Inc., No. 09 Civ.

0551(VM), 2009 WL 3241538, at *7 (S.D.N.Y. Sept. 29, 2009); see also JPMorgan Chase Bank,

N.A. v. IDW Group, LLC, No. 08 Civ. 9116(PGG), 2009 WL 321222, at *4-5 (S.D.N.Y. Feb. 9,

2009) (collecting cases dismissing breach of covenant of good faith and fair claim dealing as

duplicative of breach of contract claim).

Fillmore's claims for breach of contract and breach of the implied covenant of good faith and fair dealing both stem from the same alleged conduct by Capmark and CFI: inducing the Borrowers to default on the Junior Note, and breaching the last look agreement by selling the Senior Note without giving the Borrowers a chance to purchase it first.[9]  (Compare Cmplt. ¶¶ 64-65 and ¶¶ 72-73)  Accordingly, Fillmore's good faith and fair dealing claim against Capmark as alter ego for CFI must be dismissed as duplicative of its breach of contract claim.

In addition, the implied covenant of good faith and fair dealing "only applies where an implied promise is so interwoven into the contract as to be necessary for effectuation of the purposes of the contract." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407 (2d Cir. 2006) (internal quotations omitted).  "For this to occur, a party's action must directly violate an obligation that may be presumed to have been intended by the parties." Id. at 407-08 (internal quotation omitted).  Accordingly, "[t]he implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract.  It does not add to the contract a substantive provision not included by the parties." Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005) (internal quotation and citation omitted).  Thus, Plaintiff bears "a heavy burden" in bringing a duty of good faith and fair dealing claim, because it must prove "not merely that it would have been better or more sensible to include such a covenant, but rather that the particular unexpressed promise sought to be enforced is in fact implicit in the agreement

---

[9]  With regard to the last look agreement, Fillmore's claim for breach of the covenant of good faith and fair dealing also fails because it has not established that this was a valid agreement that was enforceable by Fillmore.  See Beekman Investment Partners, L.P. v. Alene Candles, Inc., No. 05 Civ. 8746 (DLC), 2006 WL 330323, at *7 (S.D.N.Y. Feb. 14, 2006) ("[A] 'cause of action for breach of an implied duty of good faith and fair dealing . . . [is] properly dismissed for lack of a valid and binding contract from which such a duty would arise.'"  (quoting American-European Art Assocs., Inc. v. Trend Galleries, Inc., 641 N.Y.S.2d 835, 836 (1st Dep't 1996)).

23

viewed as a whole." DBT, 544 F. Supp. 2d at 384 (quoting Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62 (1978)).

Fillmore has not met that heavy burden.  The Complaint does not allege that Capmark owed any express duty to Fillmore under the Servicing Agreement, and Fillmore has not cited any case law suggesting that a party that has no express duties to another party under a contract may still owe that party implied duties.[10]  Moreover, such an implied contract would be inconsistent with the Servicing Agreement when viewed as a whole.  As Capmark argues, the Servicing Agreement expressly prioritizes Capmark's Senior Note over Fillmore's Junior Note, and expressly limits the co-lenders' liability to one another.  (Def. Br. 11, 15, 19)  These limitations reinforce the principal that "the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract."  Thyroff, 460 F.3d at 408.  Accordingly, to the extent that Fillmore's good faith and fair dealing claim is based on the theory that Capmark owed Fillmore this duty under the Servicing Agreement, that claim must be dismissed.

Fillmore also argues, however, that Capmark breached the covenant of good faith and fair dealing implicit in the August 18, 2010 Pre-Negotiation Agreement ("PNA").  (Pltf. Br. 16-17)  When pleading a breach of the covenant of good faith and fair dealing, like any other

---

[10]  Fillmore argues that its tort claims against Capmark are "'connected' to the contractual relationship with Capmark," but does not explain the basis for that contractual relationship in light of the fact that Capmark owes Fillmore no express duties under the Servicing Agreement.  (See Pltf. Br. 21)  The cases cited by Fillmore do not support its position.  (See Pltf. Br. 21-22)  In MBIA Ins. Co. v. GMAC Mortg. LLC, 914 N.Y.S.2d 604, 611-12 (Sup. Ct. N.Y. Co. 2010), the plaintiff's breach of good faith and fair dealing claim against the defendant was dismissed as duplicative of its breach of contract claim against the same defendant.  And Kosowsky v. Willard Mountain, Inc., 90 A.D.3d 1127, 1129-30 (3d Dep't 2011) holds only that a plaintiff can bring fraud claims against a defendant with whom it had no contractual relationship.  The plaintiff's claim for breach of good faith and fair dealing was permitted to proceed only against defendants that were parties to the underlying contract or allegedly bound by it.  Id. at 1129, 1131-32.

breach of contract claim, "the complaint must at a minimum set forth the terms of the agreement upon which liability is predicated, either by express reference or by attaching a copy of the documents comprising the agreement." <u>Kaleida Health v. Medtronic Sofamor Danek USA, Inc.</u>, No. 05–CV–0675C(F), 2006 U.S. Dist. LEXIS 92295, at *8 (S.D.N.Y. Dec. 21, 2006).

Here, the Complaint makes no reference to the PNA when pleading this cause of action. (See Cmplt. ¶¶ 70-77) While Fillmore references the PNA earlier in the Complaint (Cmplt. ¶¶ 44-46), it does not disclose its terms or attach a copy of the agreement. Accordingly, Fillmore has failed to adequately plead any breach of the PNA terms, whether express or implied.

Fillmore's claim for breach of the implied covenant of good faith and fair dealing will be dismissed.

### C.  <u>Breach of Fiduciary Duty</u>

Fillmore's third cause of action alleges that Capmark and CFI breached fiduciary duties owed to Fillmore, and that Capmark also aided and abetted CFI's breach of its fiduciary duty. (Cmplt. ¶¶ 78-85) "In order to prevail on the tort claim of breach of fiduciary duty, a plaintiff must prove: (1) a fiduciary duty existing between the parties; (2) the defendant's breach of that duty; and (3) damages suffered by the plaintiff which were proximately caused by the breach." <u>Metropolitan West Asset Mgmt., LLC v. Magnus Funding, Ltd.</u>, 2004 WL 1444868, at *8 (S.D.N.Y. June 25, 2004) (citing <u>Weiss, Peck & Greer, LLC v. Robinson</u>, No. 03 Civ. 0209 (RWS), 2003 WL 1396436, at *7 (S.D.N.Y. Mar. 19, 2003).

Capmark argues that this claim should be dismissed as duplicative of Fillmore's breach of contract claim. (Def. Br. 14-15) Where a "plaintiff's breach of fiduciary duty claim arises out of the same facts as its breach of contract claim . . . [the fiduciary duty claim] is . . .

insufficient." <u>Metropolitan West</u>, 2004 WL 1444868, at *8; <u>see also</u> <u>Banco Espirito Santo de</u>

<u>Investimento, S.A. v. Citibank, N.A.</u>, No. 03 Civ. 1537 (MBM), 2003 WL 23018888, at *15

(S.D.N.Y. Dec. 22, 2003) ("'A cause of action which is merely duplicative of a breach of

contract claim cannot stand.'" (quoting <u>William Kaufman Org., Ltd. v. Graham & James, LLP</u>,

269 A.D.2d 171, 173 (1st Dep't 2000))).

      Here, Fillmore's claims for breach of contract and breach of fiduciary duty both

stem from Capmark and CFI's alleged inducement of the Borrowers to default on the Junior

Note, and their alleged breach of the last look agreement by selling the Senior Note without

giving the Borrowers a chance to purchase it first.  (<u>Compare</u> Cmplt. ¶¶ 64-65 <u>and</u> ¶ 81)

Accordingly, Fillmore's breach of fiduciary duty claim against Capmark as alter ego of CFI must

be dismissed as duplicative of its breach of contract claim.  "Because the underlying claim

against [Capmark as alter ego of CFI] for breach of fiduciary duty . . . is dismissed for failure to

state a claim, the related aiding and abetting claim against [Capmark] is also dismissed." <u>In re</u>

<u>Stillwater Capital Partners Inc. Litig.</u>, 851 F. Supp. 2d 556, 574 (S.D.N.Y. 2012).

      Capmark further argues that the Complaint fails to sufficiently allege that

Capmark itself owed Fillmore a fiduciary duty.  (Def. Br. 16-18)  "As a general matter, banks

who participate in loans together are not fiduciaries, but act at arm's length." <u>330 Acquisition</u>

<u>Co. v Regency Sav. Bank</u>, 306 A.D.2d 154, 155 (1st Dep't 2003) (citing <u>Banque Arabe et</u>

<u>Internationale D'Investissement v Maryland Nat'l Bank</u>, 57 F.3d 146, 158 (2d Cir. 1995)).

Accordingly, "[a]ny fiduciary duties between banks participating in a loan must be created by

'unequivocal language' in the participation agreement."  <u>Id.</u> (citing <u>Banco Espanol de Credito v.</u>

<u>Security Pac. Natl. Bank</u>, 763 F. Supp. 36, 44-45 (S.D.N.Y. 1991)).  The Complaint does not

point to any language, much less "unequivocal language," in any of the contracts at issue that

creates a fiduciary duty on Capmark's part.  "Indeed, the [Servicing Agreement] expressly limited the parties' liability to acts of gross negligence or intentional misconduct.  This is plainly inconsistent with the creation of a fiduciary relationship, which entails duties of the utmost loyalty and care."  Id. (internal quotation and citation omitted); (see Feder Aff., Ex. 2 (Servicing Agreement) § 10(a)).  Accordingly, Fillmore has not adequately alleged that Capmark itself owed it any fiduciary duty and this claim will be dismissed.

> ### D.        Tortious Interference with Contract

As its fourth cause of action, Fillmore alleges that Capmark and CFI tortiously interfered with the Loan Agreement and the Junior Note "[b]y inducing Borrower to decline to extend the Maturity Date and to instead permit a default under the Loan Agreement to occur . . . ."  (Cmplt. ¶¶ 86-90)  "Under New York law, a tortious interference claim requires a showing that a valid contract exists and that a third party with knowledge of the contract intentionally and improperly procured its breach."  TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 88 (2d Cir. 2005) (citing Finley v. Giacobbe, 79 F.3d 1285, 1294 (2d Cir. 1996)).  "An important qualification exists:  One asserting a tortious interference claim must also show that the defendant was not a party to the contract with which he allegedly interfered."  Id. (citing Finley, 79 F.3d at 1295; Winicki v. City of Olean, 203 A.D.2d 893, 894 (4th Dep't 1994)); see also Longmire v. Wyser-Pratte, No. 05 Civ. 6725(SHS), 2007 WL 2584662, at *17 (S.D.N.Y. Sept. 6, 2007) ("'[U]nder New York law, a party cannot be held liable for interfering with [his] own contract.'") (quoting Campbell v. Grayline Air Shuttle, Inc., 930 F. Supp. 794, 804 (E.D.N.Y. 1996)).

Capmark argues that the tortious interference with contract claim must be dismissed because Capmark and CFI are signatories to the Loan Agreement.  (Def. Br. 20)

Indeed, Fillmore acknowledges that Capmark and CFI are parties to the Loan Agreement (Cmplt. ¶ 10), and therefore a claim against Capmark for tortious interference with this contract cannot stand.

Capmark further argues that Fillmore has failed to allege a claim of tortious interference with the Junior Note, because the Borrowers' payment of the Extension fee – the right with which Capmark and CFI allegedly interfered – accrues to the Borrowers under the Loan Agreement, not the Junior Note.  (Def. Br. 20)  Fillmore acknowledges that the Borrowers' right to extend the Maturity Date stems from the Loan Agreement.  (Cmplt. ¶ 15)  Moreover, Fillmore has not pled that the Borrowers were parties to the Junior Note, and if so, what rights and obligations they had under that Note.  (See id. ¶ 18)  Accordingly, the Complaint fails to state a claim for tortious interference with the Junior Note.

### E.      Gross Negligence and Willful Misconduct

In its fifth cause of action, Fillmore alleges that Capmark and CFI were grossly negligent in performing their duties under the Loan Agreement and the Servicing Agreement when they induced the Borrowers to default on the Loan and not extend the Maturity Date.  (Id. ¶¶ 91-98)  "To state a claim for gross negligence under New York law, [a plaintiff] must establish four elements: (1) the existence of a duty; (2) a breach of that duty; (3) 'injury as a result thereof;' and (4) conduct that 'evinces a reckless disregard for the rights of others or "smacks" of intentional wrongdoing.'"  Purchase Partners, LLC v. Carver Federal Sav. Bank, No. 09 Civ. 9687(JMF), 2012 WL 6641633, at *13 (S.D.N.Y. Dec. 13, 2012) (quoting Farash v. Cont'l Airlines, Inc., 574 F. Supp. 2d 356, 367-68 (S.D.N.Y. 2008) (quoting AT & T v. City of N.Y., 83 F.3d 549, 556 (2d Cir. 1996)).

Capmark argues that Fillmore's gross negligence claim should be dismissed as duplicative of Fillmore's breach of contract claim.  (Def. Br. 14-15)  Under New York law, "the duty giving rise to a gross negligence claim must be independent of the duty arising from a contract.  That is, a party cannot sustain a tort claim if it 'does no more than assert violations of a duty which is identical to and indivisible from the contract obligations which have allegedly been breached.'"  Purchase Partners, 2012 WL 6641633, at *13 (quoting Clarendon Nat'l Ins. Co. v. Health Plan Adm'rs, No. 08 Civ. 6279(GBD), 2009 WL 3053736, at *3 (S.D.N.Y. Sept. 24, 2009)); see also Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 58 (2d Cir. 2012) (holding that gross negligence claim must be dismissed as duplicative of a breach of contract claim "unless a legal duty independent of the contract itself has been violated") (citing Clark-Fitzpatrick v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1987)).  Here, Fillmore's claims for breach of contract and gross negligence both stem from Capmark and CFI's alleged inducement of the Borrowers to default on the Junior Note.  (Compare Cmplt. ¶ 64 and ¶ 94 and ¶ 102)  Accordingly, Fillmore's gross negligence against Capmark as alter ego of CFI must be dismissed as duplicative of its breach of contract claim.

Fillmore also brings claims for gross negligence and willful misconduct directly against Capmark.[11]  (Cmplt. ¶¶ 91-105)  Capmark argues, however, that Fillmore has failed to

---

[11]  The term "willful" "is synonymous with 'wanton' and 'reckless', and the three terms are grouped together as an aggravated form of negligence indicating that the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."  Metro. Life Ins. Co. v. Noble Lowndes Intern., Inc., 600 N.Y.S.2d 212, 216 (1st Dep't 1993).  Here, the Complaint alleges the same wrongful action – that Capmark wrongfully induced the Borrowers to default on the Loan (Cmplt. ¶¶ 95, 102) – and the same damages (compensatory damages not less than $50 million, plus punitive damages (Cmplt. ¶¶ 97-98, 104-05)) – and simply employs the terms "reckless" and "wanton" in the fifth cause of action, and the term "willful" in the sixth cause of action.  Accordingly, these causes of action are duplicative and will be considered together.

sufficiently allege the threshold element – that Capmark owed a duty to Fillmore.  According to

Capmark, Fillmore's "gross negligence claim rests on the duty of care owed to Fillmore as

expressed through the [Servicing Agreement's] Servicing Standard" and "that obligation is owed

only by non-party CFI."  (Def. Br. 21-22)  As discussed above, the Court agrees that only CFI is

bound by the Servicing Standard, but Fillmore is attempting to assert a claim outside the

Servicing Agreement contract.

      As the New York Court of Appeals has explained:

> A tort obligation is a duty imposed by law to avoid causing injury to others.  It is
> apart from and independent of promises made and therefore apart from the
> manifested intention of the parties to a contract.  Thus, defendant may be liable in
> tort when it has breached a duty of reasonable care distinct from its contractual
> obligations, or when it has engaged in tortious conduct separate and apart from its
> failure to fulfill its contractual obligations. . . . [W]here a party engages in conduct
> outside the contract but intended to defeat the contract, its extraneous conduct
> may support an independent tort claim.

N.Y. Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 316 (1995) (internal quotations and citations

omitted).

      Here, Fillmore alleges that Capmark's duty stems not from the Servicing

Agreement's Servicing Standard, but from Capmark's status "[a]s a Co-Lender of the Loan,"

which obligated Capmark "to exercise care in its actions concerning the Loan Agreement and the

Servicing Agreement."  (Cmplt. ¶ 93)  Thus, Fillmore has alleged that Capmark owed it a duty

independent of the Servicing Standard.

      That being said, Fillmore's claim for gross negligence fails, because the

Complaint does not articulate what the duty of a co-lender entails.  In the context of a contract

that explicitly limits the co-lenders' obligations towards one another and explicitly prioritizes

Capmark's Senior Note over Fillmore's Junior Note (see Def. Br. 11, 15, 19), it is not sufficient

for Fillmore to vaguely assert that Capmark owed it a duty of care.  See Cohen v. Avanade,

Inc., 874 F. Supp. 2d 315, 326-327 (S.D.N.Y. 2012) (dismissing negligence claim when

complaint included only conclusory allegations of the duty of care owed by defendants) (citing

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 390 (1987) ("Merely charging a

breach of a 'duty of care,' employing language familiar to tort law, does not, without more,

transform a simple breach of contract into a tort claim.")).  Accordingly, Fillmore has failed to

state a claim for gross negligence against Capmark.

## IV.   <u>LEAVE TO AMEND</u>

By letter dated January 6, 2012, Fillmore requested leave to amend the Complaint

to add CFI as a Defendant.  Under the Federal Rules of Civil Procedure, leave to amend should

be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  District courts "ha[ve]

broad discretion to decide whether to grant leave to amend."  Gurary v. Winehouse, 235 F.3d

792, 801 (2d Cir. 2000).  A court may properly deny leave to amend in cases of "'undue delay,

bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

amendments previously allowed, undue prejudice to the opposing party by virtue of the

allowance of the amendment, futility of amendment, etc.'"  Ruotolo v. City of N.Y., 514 F.3d

184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see also Murdaugh

v. City of N.Y., No. 10 Civ. 7218(HB), 2011 WL 1991450, at *2 (S.D.N.Y. May 19, 2011)

("Although under Rule 15(a) of the Federal Rules of Civil Procedure leave to amend complaints

should be 'freely given,' leave to amend need not be granted where the proposed amendment is

futile." (citations omitted)).  An amendment is futile where it is legally insufficient on its face

such that the amended claim could not survive a motion to dismiss.  Lucente v. IBM Corp., 310

F.3d 243, 258 (2d Cir. 2002).  A claim can only withstand a Rule 12(b)(6) motion, of course, if it

contains sufficient facts to "'state a claim for relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).

Here, it does not appear that an amendment adding CFI as a defendant on Fillmore's breach of contract claim would be futile.  As explained above, the Complaint alleges that CFI was the Servicer named in the Servicing Agreement, and that as such, CFI had a duty to act in accordance with the Servicing Standard provision of the Servicing Agreement.  (Cmplt. ¶¶ 22-25)  The Complaint alleges that CFI breached the Servicing Standard and injured Fillmore when it induced Borrowers to default on the Loan.  (Id. ¶¶ 64, 67)  These allegations appear sufficient to state a claim for breach of contract against CFI.  CFI will not be prejudiced by this amendment, given that these allegations have already been asserted in the Complaint and that Fillmore merely seeks to assert liability against CFI directly instead of against its alleged alter ego, Capmark.

Any amendment adding CFI as a defendant to Fillmore's tort claims would be futile, however, to the extent that this Court has ruled that those tort claims are duplicative of the breach of contract claim or otherwise legally insufficient.  Accordingly, Fillmore is granted leave to amend the Complaint to assert a breach of contract claim against CFI.  Its application for leave to amend is otherwise denied.  Should Fillmore seek to make additional amendments to the Complaint, it will proceed by motion in accordance with this Court's Individual Rules.

## CONCLUSION

For the reasons stated above, Capmark's motion to dismiss is granted as to Counts 1 through 6 of the Complaint, and denied as moot as to Counts 7 and 8 of the Complaint. Fillmore is hereby granted leave to amend the Complaint to assert a cause of action for breach of contract against CFI.  Fillmore will serve and file its amended complaint within 30 days from the date of this Order.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 23).

Dated: New York, New York
       March 30, 2013

SO ORDERED.

Paul G. Gardephe
United States District Judge